891 F.2d 1087
 GOOD, Sandra and Good, Jochebed, minor child,
v.
DAUPHIN COUNTY SOCIAL SERVICES FOR CHILDREN AND YOUTH;
Hooper, W.N., Individually and in his official capacity as
weekend caseworker for Dauphin County Social Services for
Children & Youth; O'Neill, Eileen, Individually and in her
official capacity as caseworker supervisor for Dauphin
County Social Services for Children & Youth; Harrisburg
Penna. Police Dept., Doe, Jane, Individually and in her
official capacity as a Harrisburg, Pa. Police Officer.
Appeal of Sandra and Jochebed GOOD.
 No. 88-5792.
 United States Court of Appeals,
Third Circuit.
 Argued May 23, 1989.
Decided Dec. 15, 1989.
 
 Professor Thomas M. Place (argued), Dickinson School of Law, Carlisle, Pa., for appellants.
 Edward E. Knauss, IV (argued), Metzger, Wickersham, Knauss & Erb, Harrisburg, Pa., for appellees, Dauphin County Social Services for Children and Youth, W.N. Hooper and Eileen O'Neill.
 Thomas E. Brenner (argued), Goldberg, Katzman & Shipman, Harrisburg, Pa., for appellees, Harrisburg Police Dept. and Melissa Sweigart.
 Before BECKER, STAPLETON, and ROSENN, Circuit Judges.
 OPINION OF THE COURT
 STAPLETON, Circuit Judge:
 
 I.
 
 1
 This is an appeal from the grant of summary judgment against plaintiffs Sandra Good and her daughter Jochebed Good and in favor of the defendants, Dauphin County Social Services for Children and Youth ("Social Services"), Social Services Caseworker W.N. Hooper, Social Services Caseworker Supervisor Eileen O'Neill, Harrisburg Pennsylvania Police Department, and Police Officer Melissa Sweigart. Two issues are presented for our consideration. First, whether the Pennsylvania Child Protective Services Law, 11 Pa.Stat.Ann. §§ 2201-2224 (Purdon Supp.1989), can immunize defendants for any violation of plaintiffs' Fourth Amendment rights, and second, whether the defendants are entitled to qualified immunity. We conclude that: 1) Pennsylvania's Child Protective Services Law cannot immunize defendants from a suit alleging a violation of a federal law; 2) defendants Hooper and Sweigart were not entitled to summary judgment on qualified immunity grounds; 3) the defendant agencies are not entitled to summary judgment on qualified immunity grounds; and 4) defendant O'Neill is entitled to summary judgment on grounds of qualified immunity because plaintiffs have not asserted that she violated any clearly established federally secured right. Our review of a grant or denial of summary judgment is plenary. Like the district court, we must view the facts in the light most favorable to the non-moving party. Anderson v. Liberty Lobby, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986).
 
 II.
 
 2
 Social Services received anonymous information, apparently sometime on Thursday, April 23, 1987, concerning possible child abuse of Jochebed Good, then aged seven. The only record evidence of what that information was is the defendants' representation, not contested by the plaintiffs, that "[i]n particular, it was reported that Jochebed Good had bruises on her body and that Jochebed Good herself had indicated that certain bruises were caused by a fight with her mother." Defendants' Statement of Undisputed Facts p 1.
 
 
 3
 The evidence regarding the events of the next day is conflicting. According to the defendants, Jochebed was not in school the next morning and a Social Services caseworker tried unsuccessfully to contact Ms. Good by telephone. That evening defendant Hooper was assigned to visit the Good home. On route to the Good residence, Hooper saw Harrisburg Police Officer Melissa Sweigart and asked her to accompany him to the Good home. Hooper told Sweigart that he had received a report of possible child abuse and "that by law he must observe the child for physical indications of abuse." Affidavit of Melissa Sweigart p 3. After receiving permission from her supervisor and being told not to forcibly enter the Good abode, Officer Sweigart accompanied Hooper to the plaintiffs' home. Ms. Good responded to their knock and voluntarily admitted them. They examined Jochebed with Ms. Good's consent, found no evidence of physical abuse, and departed.
 
 
 4
 Ms. Good tells a materially different story in her verified, pro se complaint:
 
 
 5
 4. At about 10 P.M. on Friday, 24 April, 1987, Sandra Good was alarmed by very loud pounding and loud hollering at her door. The commotion was so extreme that it startled awake the child Jochebed Good who'd been put to bed about an hour earlier, and likely attracted the alarm and attention of neighbors.
 
 
 6
 5. Uneasy in face of the late hour and the very loud noise, Sandra Good hesitantly peeked out and saw a female dressed as a city Police officer and identified herein as Jane Doe, and a large black man dressed in casual clothing and later identified as W.N. Hooper. To Sandra Good's inquiry, Hooper announced that they were from C and Y [Social Services] and that "you must let us see your daughter."
 
 
 7
 6. Hooper demanded entry and Sandra Good demanded to see a Warrant or a Court Order. Hooper said that they needed no warrant and that they had a report that her daughter had been abused and she must let them enter.
 
 
 8
 7. Sandra Good wanted to telephone a lawyer, but could not do so because of the hour. Similarly, the late hour even precluded her telephoning C and Y. She did not want to admit strangers into her house at that hour. She told Hooper and Officer Doe as much. Hooper reiterated that she must allow him to enter without a warrant or court order. Officer Jane Doe at that point used a hand-held radio she was carrying to notify someone that she'd been "flagged down" by Hooper and that they were going into 1324 Derry Street.
 
 
 9
 8. At this point Sandra Good allowed Hooper and Officer Jane Doe to enter telling them that she did so only because she understood that she was being compelled to do so. Neither Hooper nor Officer Jane Doe explained her rights to her nor to Jochebed Good.
 
 
 10
 9. Hooper demanded to see the little girl, Jochebed Good, but when Sandra Good called her into the hall and the child was confronted by the very large hostile man and the uniformed police officer, she ran back into another room. Hooper chased the terrified child down the hallway.
 
 
 11
 10. Sandra Good protested adamantly about Hooper's and Doe's conduct, about the late hour and about startling her young daughter out of bed. Her protests were ignored. Hooper then confronted and questioned Jochebed Good in a frightening and aggressive manner.
 
 
 12
 ....
 
 
 13
 12. Hooper then filled out a letter of notice which explains the Child Protective Services Law.... He then claimed that previous efforts had been made on that day to contact Sandra Good. Since Sandra Good has a listed telephone number and since she was home after 1 PM that afternoon, Sandra Good believes she would be aware of any legitimate attempt to contact her and none was, to her knowledge, made.
 
 
 14
 13. .... At Hooper's instruction and without the consent of either the mother, Sandra Good, or the child, Jochebed Good, and with no indication that the child was injured, the policewoman stripped and inspected Jochebed Good's body, ostensibly for marks or injuries. No injuries were found.
 
 
 15
 14. Both Jochebed Good and her mother were left shocked and shaken, deeply upset and worried.
 
 
 16
 This civil rights action was filed on July 17, 1987. The district court granted summary judgment to Sweigart and the Police Department on June 30, 1988, and to the remaining defendants on September 27, 1988.
 
 III.
 
 17
 Defendants argue that the district court was correct in granting them summary judgment on the grounds that Pennsylvania's Child Protective Services Law "specifically grants immunity to those carrying out its provisions" by declaring that:
 
 
 18
 Any person, hospital, institution, school, facility or agency participating in good faith in the making of a report, cooperating with an investigation or testifying in any proceeding arising out of an instance of suspected child abuse ... shall have immunity from any liability, civil or criminal, that might otherwise result by reason of such actions.
 
 
 19
 11 Pa.St.Ann. § 2211 (emphasis added).
 
 
 20
 Even assuming that this statute extends to officials such as Hooper and Sweigart, who are conducting, rather than cooperating with, an investigation, state law cannot immunize government employees from liability resulting from their violation of federal law. In Wade v. City of Pittsburgh, we held that:
 
 
 21
 [A state] immunity statute, although effective against a state tort claim, has no force when applied to suits under the Civil Rights Acts. The supremacy clause of the Constitution prevents a state from immunizing entities or individuals alleged to have violated federal law. This result follows whether the suit to redress federal rights is brought in state or federal court. Were the rule otherwise, a state legislature would be able to frustrate the objectives of a federal statute.
 
 
 22
 765 F.2d 405, 407-408 (3d Cir.1985) (citations omitted). Thus, even assuming that its terms are applicable to the instant case, the Pennsylvania Child Protective Services Law cannot immunize the defendants from liability resulting from a violation of federal law, and therefore cannot serve as a basis for upholding the summary judgment entered in their favor.
 
 IV.
 A.
 
 23
 Hooper and Sweigart argue that the grant of summary judgment in their favor was appropriate because they were entitled to immunity for their actions of April 24, 1987 under the doctrine of qualified immunity. We disagree.
 
 
 24
 "[G]overnment officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1981). On the other hand, "[i]f the law [violated] was clearly established, the immunity defense ordinarily should fail, since a reasonably competent official should know the law governing his conduct." Id. at 818-819, 102 S.Ct. at 2738. State law enforcement officials making judgments in connection with searches and seizures perform functions sufficiently discretionary to qualify for the immunity defense. See Malley v. Briggs, 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986); Anderson v. Creighton, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).
 
 
 25
 The Supreme Court recently provided additional guidance on qualified immunity analysis in Anderson v. Creighton, supra. There the plaintiff alleged that an FBI agent had conducted a warrantless search of the plaintiff's house without probable cause and exigent circumstances, and had found nothing. The Eighth Circuit rejected the defendant's qualified immunity claim, reasoning that the claim stated in plaintiff's complaint, that the defendant had engaged in an unreasonable warrantless search without probable cause, alleged a violation of a clearly established legal right. The Supreme Court reversed, stressing that an inquiry as to whether a "clearly established" right has been violated must be conducted with some particularity lest the Harlow rule become divorced from its rationale:
 
 
 26
 The operation of [the Harlow ] standard ... depends substantially upon the level of generality at which the relevant "legal rule" is to be identified. For example, the right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right. Much the same could be said of any other constitutional or statutory violation. But if the test of "clearly established law" were to be applied at this level of generality, it would bear no relationship to the "objective legal reasonableness" that is the touchstone of Harlow.... It should not be surprising, therefore, that our cases establish that the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of preexisting law the unlawfulness must be apparent.
 
 
 27
 Id. 483 U.S. at 639-40, 107 S.Ct. at 3038-39 (citation omitted).
 
 
 28
 The Anderson Court further pointed out that the "reasonable official" test includes a factual as well as a legal component:
 
 
 29
 It follows from what we have said that the determination whether it was objectively legally reasonable to conclude that a given search was supported by probable cause or exigent circumstances will often require examination of the information possessed by the searching officials.... The relevant question in this case, for example, is the objective (albeit fact-specific) question whether a reasonable officer could have believed Anderson's warrantless search to be lawful, in light of clearly established law and the information the searching officers possessed. Anderson's subjective beliefs about the search are irrelevant.
 
 
 30
 Id. at 641, 107 S.Ct. at 3034.
 
 
 31
 As we read Anderson, it teaches two lessons that are important in resolving the case before us. First, in order for the governing law to be sufficiently well established for immunity to be denied, it is not necessary that there have been a previous precedent directly in point. " '[S]ome but not precise factual correspondence' to precedent" is necessary for the defendant to be charged with knowledge of the unlawfulness of his or her actions. Stoneking v. Bradford Area School District, 882 F.2d 720, 726 (3d Cir.1989) (quoting People of Three Mile Island v. Nuclear Regulatory Comm., 747 F.2d 139, 144 (3d Cir.1984)). The ultimate issue is whether, despite the absence of a case applying established principles to the same facts, reasonable officials in the defendants' position at the relevant time could have believed, in light of what was in the decided case law, that their conduct would be lawful. Second, even where the officials clearly should have been aware of the governing legal principles, they are nevertheless entitled to immunity if based on the information available to them they could have believed their conduct would be consistent with those principles. With these teachings in mind we turn to the state of the law at the relevant time, and then to the information available to the defendants in this case.
 
 
 32
 In this case the "contours of the right[s]" relied upon by the plaintiffs were sufficiently well established in April of 1987 that Hooper and Sweigart should have known what the Constitution required of them. The decided case law made it clear that the state may not, consistent with the prohibition of unreasonable searches and seizures found in the Fourth and Fourteenth amendments, conduct a search of a home or strip search of a person's body in the absence of consent, a valid search warrant, or exigent circumstances. Under that caselaw, not only the protected privacy interests but also the exculpatory concepts of "consent" and "exigent circumstances" in this context were well defined.
 
 
 33
 "[P]hysical entry into the home is the chief evil against which the ... Fourth Amendment is directed." United States v. United States District Court, 407 U.S. 297, 313, 92 S.Ct. 2125, 3134, 32 L.Ed.2d 752 (1972). "At the very core [of the Fourth Amendment and the personal rights it secures] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." Silverman v. United States, 365 U.S. 505, 511, 81 S.Ct. 679, 683, 5 L.Ed.2d 734 (1961). See also Payton v. New York, 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980) ("It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable."); Coolidge v. New Hampshire, 403 U.S. 443, 474-75, 91 S.Ct. 2022, 2042, 29 L.Ed.2d 564 (1970) ("It is accepted, at least as a matter of principle, that a search or seizure carried out on a suspect's premises without a warrant is per se unreasonable, unless the police can show that it falls within one of a carefully defined set of exceptions based on the presence of 'exigent circumstances.' ").
 
 
 34
 "A search of a child's person ... no less than a similar search carried out on an adult, is undoubtedly a severe violation of subjective expectations of privacy." New Jersey v. T.L.O., 469 U.S. 325, 337-38, 105 S.Ct. 733, 740-41, 83 L.Ed.2d 720 (1985). See also Doe v. Renfrow, 631 F.2d 91, 92-93 (7th Cir.1980) cert. denied 451 U.S. 1022, 101 S.Ct. 3015, 69 L.Ed.2d 395 (1981) ("It does not require a constitutional scholar to conclude that a nude search of a thirteen-year-old child is an invasion of constitutional rights of some magnitude. More than that: it is a violation of any known principle of human dignity.").
 
 
 35
 While even an intrusion of the magnitude involved in a search of one's home and a strip search of one's body is constitutional if the state secures consent, the consent required must be freely given. It is ineffective if extracted by the state under threat of force or under claim of government authority. The Supreme Court reviewed its cases on this subject in Schneckloth v. Bustamonte and summarized the law as follows:
 
 
 36
 [I]f under all the circumstances it has appeared that the consent was not given voluntarily--that it was coerced by threats or force, or granted only in submission to a claim of lawful authority--then we have found the consent invalid and the search unreasonable.
 
 
 37
 412 U.S. 218, 233, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). See also Amos v. U.S., 255 U.S. 313, 317, 41 S.Ct. 266, 268, 65 L.Ed. 654 (1921) ("[T]he contention that the constitutional rights of defendants were waived when his wife admitted to his home the Government officers, who came, without search warrant, demanding admission to make search of it under Government authority, cannot be entertained.... for it is perfectly clear that under the implied coercion here presented, no such waiver was intended or effected.").
 
 
 38
 "Exigent circumstances" in this context is a shorthand for a number of related exceptions to the normal requirement of a search warrant as a predicate to a constitutional strip search or search of a home. Although neither Hooper nor Sweigart expressly invoked an exigent circumstance exception before the district court or in their briefs before us, they do urge that their challenged searches were reasonable because of the need to ascertain whether Jochebed was a victim of child abuse and to protect her if she was. For this reason we infer that they rely upon the line of cases sustaining emergency intrusions undertaken in order to protect or preserve life or avoid serious bodily injury. "The right of the police to enter and investigate in an emergency ... is inherent in the very nature of their duties as peace officers, and derives from the common law." United States v. Barone, 330 F.2d 543, 545 (2d Cir.), cert. denied 377 U.S. 1004, 84 S.Ct. 1940, 12 L.Ed.2d 1053 (1964). See also Mincey v. Arizona, 437 U.S. 385, 392, 98 S.Ct. 2408, 2413, 57 L.Ed.2d 290 (1978); Wayne v. United States, 318 F.2d 205, 212 (D.C.Cir.), cert. denied 375 U.S. 860, 84 S.Ct. 125, 11 L.Ed.2d 86 (1963) (Burger, J., concurring) ("The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency."); II Lafave, Search & Seizure §§ 6.5(d) & 6.6 (1987). Unlike cases involving other "exigent circumstances" exceptions, these cases do not require probable cause to believe a person is subject to arrest or that the tools, fruits or evidence of a crime will be found on the premises to be searched. See United States v. Booth, 455 A.2d 1351, 1354 (D.C.App.1983); State v. Jones, 45 Or.App. 617, 608 P.2d 1220, 1222 (1980).[1] However, given the rationale for this very limited exception, the state actors making the search must have reason to believe that life or limb is in immediate jeopardy and that the intrusion is reasonably necessary to alleviate the threat. People v. Smith, 7 Cal.3d 282, 286, 101 Cal.Rptr. 893, 895, 496 P.2d 1261, 1263 (1972) ("[T]he exception must not be permitted to swallow the rule: in the absence of a showing of true necessity--that is, an imminent and substantial threat to life, health, or property--the constitutionally guaranteed right to privacy must prevail."); Lafave, supra.
 
 
 39
 It is true that the pre-April 1987 caselaw applying these principles specifically in the context of a warrantless invasion of a home based on an alleged need to prevent child abuse is relatively sparse.[2] In this context, Hooper and Sweigart suggest that they were entitled to assume until told otherwise by the courts that child abuse cases would not be controlled by the well established legal principles developed in the context of residential intrusions motivated by less pressing concerns. We reject this suggestion. As we have noted, Anderson teaches that a prior case on all fours is not necessary; a public official may not manufacture immunity by inventing exceptions to well settled doctrines for which the case law provides no support. It evidences no lack of concern for the victims of child abuse or lack of respect for the problems associated with its prevention to observe that child abuse is not sui generis in this context. The Fourth Amendment caselaw has been developed in a myriad of situations involving very serious threats to individuals and society, and we find no suggestion there that the governing principles should vary depending on the court's assessment of the gravity of the societal risk involved.[3] We find no indication that the principles developed in the emergency situation cases we have heretofore discussed will be ill suited for addressing cases like the one before us.[4]
 
 
 40
 Thus, we conclude that Hooper and Sweigart are entitled to immunity if, but only if, the information they in fact possessed on the evening of April 24, 1987 was such as could lead a reasonable person to believe that the warrantless searches were justified in light of the above discussed law. In particular, they are not entitled to summary judgment unless, based on Ms. Good's sworn version of the facts, a reasonable person in the circumstances surrounding their searches could have believed either (1) that Mrs. Good consented to the searches; or (2) that Jochebed was in imminent danger of serious bodily injury and that their intrusions were reasonably necessary to avert that injury.
 
 
 41
 Under Ms. Good's version of the facts this is a paradigm case of "submission to a claim of lawful authority." Schneckloth, 412 U.S. at 233, 93 S.Ct. at 2051. Hooper told Ms. Good that they needed no warrant and she "must let them enter." Sweigart then told her superior by radio in Ms. Good's presence that "they were going into 1324 Derry Street." Only then did Ms. Good yield "because she understood that she was compelled to do so." Thereafter she continued to verbally protest throughout the strip search. We conclude that under these circumstances a reasonable law enforcement officer could not have believed Ms. Good had given legally effective consent to either the entry or the subsequent strip search. It is, of course, not our place to accept or reject Ms. Good's sworn version of the facts, but the district court was not entitled to disregard it.[5]
 
 
 42
 It is next necessary to consider whether, assuming Ms. Good did not consent, the searches were nonetheless justified by an emergency situation. On Ms. Good's version of the facts a trier of fact could properly conclude that the information available to Hooper and Sweigart could not have led a reasonable law enforcement officer to conclude that Jochebed was in immediate and grave peril when they approached the Good's residence. In fact, we do not understand Hooper and Sweigart to contend otherwise. A single anonymous report had indicated only that Jochebed, on a single occasion, "had bruises on her body" of unspecified severity. Moreover, Hooper and Sweigart saw and heard nothing during their conversation with Ms. Good at the open door that hinted in any way that Jochebed was being mistreated. This is hardly a rational basis for a state actor to conclude that forced entry into the residence was required to protect Jochebed from imminent harm. This is evident, among other things, from the fact that, at the time of the entry, the responsible authorities had possessed the anonymous tip for at least twenty hours.
 
 
 43
 In short, given Ms. Good's sworn version of the facts, a trier of fact could conclude that reasonable persons in the positions of Hooper and Sweigart could not have believed their conduct was lawful. It follows that they were not entitled to summary judgment on qualified immunity grounds.
 
 
 44
 In reaching this conclusion, we are not unmindful of the decision of the Court of Appeals for the Seventh Circuit in Darryl H. v. Coler, 801 F.2d 893 (7th Cir.1986). The Court in Coler was presented with a facial challenge to the constitutionality of guidelines promulgated by the Illinois Department of Children and Family Services to determine when a report of suspected child abuse requires further investigation, as well as with individual challenges to the application of those guidelines in the cases of the representative plaintiffs. Only after concluding that it could not yet rule on the facial challenge did the Coler court turn to the specific searches plaintiffs had been subjected to. The defendants, following receipt of information that two children, ages six and seven, had been abused or neglected, conducted strip searches of the children in their mother's presence during school hours in a small room adjacent to the office of the school principal. While the court declined to approve these searches, it did hold that the defendant was entitled to qualified immunity based on a finding that it was not clear under the caselaw that the searches were unreasonable. This holding was found to be mandated by the fact that the searches in question were performed in accordance with the challenged guidelines: "Since we cannot determine the constitutionality of the procedures employed by the [defendant agency] without a more fully developed record, we can hardly maintain that the individual defendants should have known that their efforts to fulfill their public responsibilities violated a clearly established constitutional right." 801 F.2d at 908.
 
 
 45
 The defendants in the instant case do not contend that their actions were taken pursuant to any established guidelines that had been provided to them by their superiors. Moreover, if Ms. Good's version of the facts is believed, the strip search in this case came in the context of a forced entry into a residence in the middle of the night. On these facts, the degree of intrusion on privacy was not at all comparable to the far more limited intrusion in Coler. We thus have no occasion here to agree or disagree with the holding of Coler; we observe only that it is of no aid to Hooper and Sweigart here.[6]
 
 V.
 
 46
 The district court based its grant of summary judgment for all the defendants on the immunity granted by the Pennsylvania Child Protective Services Law, and, alternatively, on qualified immunity. As we have held, the Pennsylvania law affords no defense to plaintiffs' constitutional claims. Moreover, the doctrine of qualified immunity cannot be applied to municipal or county agencies. Owen v. City of Independence, 445 U.S. 622, 651, 100 S.Ct. 1398, 1415, 63 L.Ed.2d 673 (1980). Therefore, summary judgment for the defendant agencies cannot be sustained on the grounds relied upon by the district court.
 
 
 47
 The defendants agencies now argue that summary judgment should be affirmed on the ground that plaintiffs failed to state a cause of action against them under section 1983, because municipal liability cannot be based upon respondeat superior, Monell v. Department of Social Services, 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978), and because plaintiffs have failed to allege that the promulgation and implementation of established policies and procedures caused the harm alleged. City of Canton v. Harris, --- U.S. ----, 109 S.Ct. 1197, 1203, 103 L.Ed.2d 412 (1989).
 
 
 48
 We believe plaintiffs' complaint can be read to allege generally that Hooper and Sweigart acted pursuant to established policies of the defendant agencies. We doubt that these allegations meet the pleading requirements this Court has established for civil rights cases, see Losch v. Borough of Parkesburg, Pa., 736 F.2d 903, 910 (3d Cir.1984), but since this issue was not specifically raised in the district court and the trial court may choose in its discretion to allow plaintiffs leave to amend their complaint, we decline the agency's invitation to affirm on this alternative ground.
 
 VI.
 
 49
 In order to withstand O'Neill's motion for summary judgment on grounds of qualified immunity, plaintiffs had the burden of coming forward with some competent evidence that O'Neill engaged in conduct that violated a clearly established federally secured right of the plaintiffs and that was a proximate cause of the alleged injuries. The only factual record reference to O'Neill appears in the amended complaint. Paragraph 15 alleges that Ms. Good called the Social Service Agency three days after the searches, was referred to O'Neill, and complained about the events of the preceding Friday evening. Paragraph 16 alleges that "O'Neill denied Sandra Good's report and denied her request for a female caseworker." These allegations, even though sworn, are insufficient to defeat O'Neill's motion for summary judgment.
 
 VII.
 
 50
 For the foregoing reasons we will affirm the summary judgment in favor of defendant O'Neill. We will reverse the remaining summary judgments and remand for further proceedings consistent with this opinion.
 
 
 
 [1]
 Hooper and Sweigart do not argue that the anonymous report of bruises of unspecified severity on a single occasion provided probable cause to believe that a crime had been committed. They went to the Good residence, in part, to determine whether such was the case. Moreover, even if this kind of probable cause had been present, exigent circumstances were not. There was no reason to believe that Ms. Good, or any evidence on the premises, would not have remained there during the period necessary to obtain a warrant
 
 
 [2]
 However, the cases we have found consistently apply the principles set forth above. Compare State v. Boggess, 340 N.W.2d 516, 115 Wis.2d 443 (1983) (applying emergency exception in child abuse situation where defendant had ample reason to believe child was in imminent danger); State v. Jones, 45 Or.App. 617, 608 P.2d 1220 (1980) (same); In re C.E. and D.E., 283 N.W.2d 554 (S.D.1979) (same); People v. Sutton, 134 Cal.Rptr. 921, 65 Cal.App.3d 341 (1977) (same), with Nelson v. State, 96 Nev. 363, 609 P.2d 717 (1980) (emergency search not warranted where child was unattended because police had arrested her mother); People v. Smith, 101 Cal.Rptr. 893, 7 Cal.3d 282, 496 P.2d 1261 (1972) (emergency search not warranted where unattended girl was locked out of apartment, but not in immediate danger)
 
 
 [3]
 To the contrary, the Supreme Court rejected such a suggestion in Mincey v. Arizona:
 [T]he State points to the vital public interest in the prompt investigation of the extremely serious crime of murder. No one can doubt the importance of this goal. But the public interest in the investigation of other serious crimes is comparable. If the warrantless search of a homicide scene is reasonable, why not the warrantless search of the scene of a rape, a robbery, or a burglary? "No consideration relevant to the Fourth Amendment suggests any point of rational limitation" of such a doctrine.
 437 U.S. 385, 393, 98 S.Ct. 2408, 2414, 57 L.Ed.2d 290 (1978) (quoting Chimel v. California, 395 U.S. 752, 766, 89 S.Ct. 2034, 2041, 23 L.Ed.2d 685 (1969)).
 
 
 [4]
 Current doctrine accommodates situations where the health of a child would have been endangered had social workers taken the time to apply for a warrant. For example, in Boggess, the Wisconsin Supreme Court found sufficient evidence for "a reasonable person [to have] believed there was an immediate need to render aid or assistance to the children due to actual or threatened physical injury," where social workers received a report that two children "may have been battered and were in need of medical attention," that one of the children was limping, and that the caller "knew the Boggesses fairly well and that Mr. Boggess had a bad temper." 340 N.W.2d at 519. See generally cases cited supra, n. 2
 
 
 [5]
 The district court does not refer to Ms. Good's sworn version of the facts and states in its memorandum decision, without explanation, that it was "undisputed ... that Sandra Good consented to admitting Mr. Hooper and Officer Sweigart into her home." The defendants suggest that this may have resulted from an application of Local Rule 401.4, which provides that
 All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party.
 M.D.Pa.R. 401.4. However, the record demonstrates the Ms. Good, in her brief opposing the Harrisburg Police Department and Melissa Sweigart's motion for summary judgment, explicitly controverted defendants' attempt to set forth consent as an undisputed fact. While Ms. Good may not have literally followed Local Rule 401.4's directions to file a "separate " statement of material facts, we decline to assume in the absence of any express indication to that effect that the district court granted summary judgment for this reason, especially in light of the facts that (1) the plaintiff represented herself, (2) the plaintiff had supplied the court with sworn statements of her eyewitness testimony in both the complaint and a follow-up affidavit, and (3) the defendants had submitted no more than a conclusory statement that there was consent.
 
 
 [6]
 As indicated by our comments distinguishing Coler, we believe that the propriety of the strip search cannot be isolated from the context in which it took place. However, the question of the propriety of the entry into the residency and the question of the propriety of the strip search are not necessarily susceptible of a single response. Therefore, even if a finder of fact should ultimately conclude that Ms. Good consented to the initial entry, it could nevertheless conclude that she did not consent to the strip search, or the manner in which it was allegedly conducted