**Richard A. HAUGE, Plaintiff,**

v.

**BRANDYWINE SCHOOL DISTRICT, Joseph P. Dejohn, Fancis A. Castelli, Ralph G. Ackerman, Paul T. Hart, Robert Blew, Nancy A. Doorey, G. Lawrence Pelkey, Jr., G. Harold Thompson, and Raymond E. Tomasetti, Jr., Defendants.**

**No. CIV. A. 00–124–RRM.**

United States District Court, D. Delaware.

Feb. 13, 2001.

where a direct review may be had in the Supreme Court." 28 U.S.C.A. § 1291 (West 2000).

Barbara H. Stratton, Knepper & Stratton, Wilmington, Delaware, for plaintiff.

Barry W. Willoughby, William W. Bowser, Young, Conaway, Stargatt & Taylor, Wilmington, Delaware, for defendants.

## OPINION

McKELVIE, District Judge.

This is a civil rights case. Plaintiff Richard A. Hauge is a Delaware resident who worked for the Brandywine School District from July, 1996 until June 30, 2000. Hauge claims that the defendants refused to renew his contract with the Brandywine School District in retaliation for his permissible First Amendment speech about accounting irregularities within the School District.

Defendant Brandywine School District is a subdivision of the State of Delaware organized for the purpose of administering public education in a defined geographic area. Defendant Board of Education of the Brandywine School District, an elected body, governs Brandywine School District.

Defendant Joseph DeJohn is the Superintendent of the Brandywine School District. Defendant Frank Castelli is the Assistant Superintendent of the Brandywine School District.

Defendant Ralph Ackerman is President of the Brandywine School Board. Defendant Paul T. Hart is Vice President of the Brandywine School Board. Defendants Robert Blew, Nancy A. Doorey, G. Lawrence Pelkey, Jr., Rev. G. Harold Thompson, and Raymond E. Tomasetti, Jr. are members of the Brandywine School Board.

On February 25, 2000, Hauge filed suit pursuant to 42 U.S.C. § 1983 alleging that adverse employment actions taken by defendants violated his rights to free speech and due process under the First and Fourteenth Amendments. Additionally, Hauge claimed that the actions of the defendants violated the Delaware Whistle Blower Statute, 29 Del. C. § 5115 and breached other common law duties.

On March 20, 2000, defendants moved for a judgment on the pleadings as to the First and Fifth Amendment claims and moved to dismiss the state law claims for lack of jurisdiction. Alternatively, the individual defendants moved for qualified immunity. Plaintiff filed an answering brief on April 12, 2000 and moved to amend the complaint. On April 17, 2000, the court entered an order granting Hauge's motion to amend. Defendants filed a reply brief in support of the motion to dismiss on April 20, 2000. Defendants answered the amended complaint on May 8, 2000.

On September 27, 2000, this court heard oral arguments on the motion for judgment on the pleadings, qualified immunity and to dismiss. This is the court's decision on that motion.

## I. FACTUAL BACKGROUND

■ The court takes the following facts from the amended complaint and defendants' answer. In considering defendants' motion for judgment on the pleadings un-

der Federal Rule of Civil Procedure 12(c), the court must view the facts in the pleadings and all reasonable inferences therefrom in favor of the nonmoving party, Hauge. *See Allah v. Al–Hafeez*, 226 F.3d 247, 249 (3d Cir.2000); *Society Hill Civic Ass'n v. Harris*, 632 F.2d 1045, 1054 (3d Cir.1980); 5A Wright & Miller, Federal Practice and Procedure § 1368 (2d ed.1990).

### A. The District Hires and Promotes Hauge

Hauge graduated from the University of Delaware with a bachelor's degree in accounting in 1977. In 1981, he obtained a Juris Doctorate degree from the Duke University School of Law. Later that year the Delaware Supreme Court admitted Hauge to practice law in the State of Delaware.

In August of 1996, Brandywine School District hired Hauge to serve as Director of Facilities. In June of 1997, the Brandywine School District merged its Departments of Administrative Services and Facilities and named Hauge Director of Administrative Services. Assistant Superintendent Castelli served as Hauge's direct supervisor.

In December of 1997, the Delaware Department of Education granted Hauge a Standard Specialized Assignment Certificate to hold the position of Director of Business and Legal Affairs for the Brandywine School District. According to Hauge, the title change did not reflect a change in his responsibilities. He claims that he oversaw the Business Office, Facilities Office, Food Service, and Graphics Department. Defendants contend that Hauge's new position included the responsibility to "oversee all legal matters affecting the District and to screen all legal matters prior to any referral to outside counsel." Further, according to defendants, in his new position Hauge served as Brandywine School District's highest ranking financial officer and its in-house legal counsel.

## B. *Accounting Irregularities Discovered*

Hauge first learned of accounting irregularities in the District on October 7, 1998 when Superintendent Joseph DeJohn informed Hauge that Board member Larry Nicholson paid for a refrigerator out of District funds and had the appliance delivered to DeJohn's house. DeJohn told Hauge that he had reimbursed the District for the purchase. At that same meeting, Hauge informed DeJohn that he had heard a rumor that Nicholson had recently purchased a computer with District funds. DeJohn claimed that he had not authorized that purchase.

The next day, Hauge met with DeJohn, Assistant Superintendent Frank Castelli, and another District employee to discuss Nicholson's actions. Hauge suggested that they contact the Delaware State Auditor or the Delaware Attorney General's Office. DeJohn and Castelli rejected that suggestion, preferring instead to keep the investigation of the allegations within the School District. The group authorized the following actions: DeJohn was directed to discuss the matter with Patrick Miller, the former Business Manager of the District,[1] Castelli was to talk to Nicholson, and Hauge was directed to retain an outside accounting firm to deal with the backlog in the Business Office. Hauge states that DeJohn and Castelli wanted the outside accounting firm "to deal with the backlog in the Business Office, but not to do any 'looking around.'"

Despite DeJohn's preference for an internal review of the allegations, Hauge called the Delaware State Auditor's Office immediately following the October 8, 1998 meeting. On October 9, 1998 Hauge spoke with Thomas Wagner, the State Auditor, about the need for an outside auditing firm

and the suspected criminal activities. Wagner recommended the accounting firm McBride & Shopa. Wagner further recommended that Hauge should use the accounting firm not only to help with the backlog, but also to investigate the alleged irregularities.

Hauge suspected that Miller had been involved in a number of suspicious transactions when he served as head of the Business Office. Therefore, immediately after his discussion with DeJohn and Castelli and throughout the next couple of weeks, Hauge continued to look for irregularities in purchasing orders authorized by Board members and to inform State Auditor Wagner of his findings. During that review, Hauge uncovered several missing payment vouchers for picture framing at a local business, "Frames with Character." The owner of the store told Hauge that Nicholson had paid for the frames with District funds. Hauge stated in his complaint that at the time of this discovery, he had never seen these pictures hung in the School District.

Following Wagner's suggestion for an accounting firm, Hauge met with a representative of McBride & Shopa on October 14, 1998. When Hauge presented DeJohn with a purchase order and letter of agreement to hire McBride & Shopa, DeJohn expressed a preference to hire another firm. DeJohn believed that his personal connections to McBride & Shopa made the selection of the firm seem improper and biased. DeJohn agreed to present the issue to the Board at a retreat scheduled for October 16 and 17, 1998.

Prior to that meeting, Hauge contacted Board members Paul Hart, Robert Blew, and Lawrence Pelkey to discuss the financial irregularities. Hauge contends that

---

1. As part of his supervision of the Business Office, Hauge oversaw the work of the Acting Supervisor of the Business Office, Patrick Miller. Miller is a central figure in Hauge's allegations. Hauge contends that the School District granted Miller "the largest salary increase of any District administrator" in the summer of 1998 despite the fact that Hauge gave Miller a negative work evaluation. Miller resigned from his position in September, 1998. Hauge contends that it is not a coincidence that the purchasing irregularities came to light shortly after Miller's resignation.

despite the fact that the Board had met on September 28, 1998 and on October 13, 1998, none of the members he contacted knew of the suspicious financial transactions.

At the School Board retreat on October 16 and 17, 1998, the Board agreed with DeJohn and decided not to retain McBride & Shopa. On October 17, 1998, Hauge reported to the Board retreat and discussed the suspicious financial transactions in the Business Office.

The decision not to hire McBride & Shopa concerned Hauge. He believed that the decision represented a delaying tactic to cover up the purchasing irregularities. Nonetheless, Hauge subsequently requested that Wagner provide him with the names of other approved accounting firms. Of the three suggestions only Ernst & Young "was large enough to handle the task within a reasonable period of time." On October 22, 1998, Hauge and DeJohn met with Ralph Ackerman, President of the School Board, and Enid Rapkin, a member of the School Board, to discuss hiring Ernst & Young. At that meeting, Hauge again pushed for McBride & Shopa, but was told to retain Ernst & Young. On October 30, 1998, officials from the School District met with representatives from Ernst & Young. During that meeting, the School District determined that it would have its law firm employ Ernst & Young.

Hauge alleges that the decision to have the law firm hire Ernst & Young was further evidence of a cover up. Hauge contends that the District sought to invoke attorney client privilege to prevent public disclosure of any irregularities that the audit might uncover. Defendants dispute this allegation.

On November 4, 1998, Wagner commenced an audit of the Brandywine School District's finances from the State Auditor's offices. Hauge contends that Wagner based his decision to begin an official audit in part on information that Hauge provided Wagner regarding the terms of the Ernst & Young engagement and the other unreported financial irregularities. Defendants contend that Hauge's improper disclosures led to Wagner's audit and that the state audit scuttled attempts to have Ernst & Young conduct an independent audit.

## C. Internal and External Communications

Hauge contends that after Wagner began his audit, DeJohn initiated a series of attacks on Hauge's propriety and ability in his position. In a meeting on November 11, 1998, DeJohn accused Hauge of divulging confidential information and engaging in insubordinate behavior. Following that meeting, DeJohn wrote Hauge a memo instructing Hauge to outline a plan to ensure confidentiality and preserve the chain of command.

Hauge responded to DeJohn's memo on January 12, 1999. In a nine-page response, Hauge admitted to contacting the Board members, but contended that the Board members needed that information in order to make sound legal judgments. Hauge further admitted to contacting the State Auditor, but contended that under 29 Del. C. § 2906,[2] he had an obligation to get

2. The Delaware Code states:

2906 Duties of the Auditor of Accounts.

    (a) The Auditor of Accounts shall conduct postaudits of all the financial transactions of all state agencies. Insofar as possible the audits shall be made no less frequently than biennially.

    (b) At least quarterly during each fiscal year, the Auditor of Accounts shall arrange for an audit to determine that the books and records maintained by the office of the Secretary of Finance are kept in accordance with generally accepted accounting principles and are reconciled with the various bank accounts. In conjunction therewith, the Auditor of Accounts shall reconcile the records maintained by the office of the Secretary of Finance with the fund balances maintained and reported by the Budget Director.

    (c) The Auditor of Accounts shall have sole responsibility for the arrangements under which the agency postaudits shall be conducted and for the selection of certified

approval from the State Auditor for any outside audits of a state agency.

After the official state audit became public information, in late February or early March, Hauge received a call from a reporter from the *News Journal*, a daily newspaper published in Delaware. In response to questions about financial improprieties Hauge said, "All I can tell you is that when these matters came to my attention, I called the State Auditor."

On March 4, 1999, Hauge wrote a memo to Castelli complaining that he was being excluded from meetings regarding the ongoing state audit.

On March 5, 1999, an employee of the Business Office, Gena Smith, reported to Hauge that in May 1998, DeJohn's secretary had received an "unusual salary advance." That same day, Hauge reported the salary advance to the State Auditor's office and told DeJohn that he had instructed Smith to provide the State Auditor's office with any documents related to the salary advance. DeJohn summoned Hauge and Castelli to his office to discuss this action. During that meeting, Hauge refused to answer questions about his communication with the State Auditor. Hauge states that as a result of his silence and his communication with the reporter from the

*News Journal,* Castelli threatened to give him a poor work evaluation.

On March 9, 1999, Castelli again admonished Hauge about his failure to maintain confidentiality and his failure to follow the chain of command.

On March 16, 1999, the State Auditor issued an interim report on the status of his investigation. The interim report discussed Nicholson's purchase with District funds of the refrigerator, several computers, a camera, and picture frames from Frames with Character. The interim report also discussed Miller's purchase at District expense of a fax machine and the purchase of a pager for DeJohn's son. The State Auditor referred a majority of these issues to the State Attorney General's office for further review. Lastly, the interim report stated that the State Auditor continued to investigate "additional questionable transactions."

On April 12, 1999, Castelli asked Hauge to divulge any information regarding the State Auditor's additional areas of concern. On April 13, 1999, Hauge responded in a memo stating that he believed that his conversations with the State Auditor were confidential. Despite Hauge's retrenched position, Castelli again requested information from Hauge on April 16, 1999. Hauge refused to divulge any information to Cas-

---

public accountants who shall make the postaudits. No other state agency or member, official or employee thereof shall have any part in, or responsibility for, the selection of the certified public accountants, nor shall they make any arrangements, agreements or contracts for the employment of the certified public accountants for the purpose of making agency postaudits.

(d) The expenses incurred for the performance of such agency postaudits upon authorization of the Auditor of Accounts shall be charged:

(1) To general fund appropriations of the General Assembly to the Office of Auditor of Accounts for Audits of general fund activity;

(2) To capital appropriations of the General Assembly to the several agencies for audits of capital·fund activity; and

(3) To general fund appropriations and/or special fund accounts for audits of special fund activity. If there is any ques-

tion as to the proper accounts to be charged, the question shall be resolved by agreement between the Auditor of Accounts and the Budget Director.

(e) This section shall not affect § 5109 of Title 14 which shall remain in full force and effect; however, any other provision which stands in conflict with this section shall be null and void.

(f) The Auditor of Accounts shall conduct postaudits of local school district tax funds budget and expenditures annually. The results of the audit shall be submitted to the local board, the State Board of Education, the office of Controller General and the local libraries within said school district.

(g) The Auditor of Accounts shall conduct postaudits of all agencies, associations and funds created directly or indirectly by the provisions of Title 18 or by the Insurance Commissioner.

29 Del. C. § 2906.

telli or DeJohn about the State Auditor's investigation.

### D. *Adverse Employment Actions*

Throughout the investigations, the Board took a number of actions regarding Hauge's status as a District employee.

On December 21, 1998, the Brandywine School Board approved the recommendation of Superintendent DeJohn and renewed Hauge's Administrative Contract for one year through June 30, 2000. Hauge contends that as a result of the DeJohn's allegations about Hauge's insubordination, the Board renewed his contract for a shorter than expected period. Hauge alleges that Board member Hart confidentially advised him that because of his call to the State Auditor's office, the Board reduced the proposed renewal term of his contract from two years to one year.

After the issuance of the State Auditor's interim report, on June 15, 1999, Castelli met with Hauge to review Hauge's Administrative Evaluation. Hauge contends that this was his first written evaluation since his date of hire. Hauge states that Castelli gave him low marks, a 2.89 out of 5. Specifically, Castelli criticized Hauge for improperly supervising Patrick Miller, failing to communicate with the Board about the State Auditor's investigation, failing to follow the chain of command, failing to share the content of his discussions with the State Auditor and Attorney General, and for providing information to the *News Journal* reporter.

On June 21, 1999, the School Board reassigned Hauge from Director of Business and Legal Affairs to Director of Management Services. In reclassifying Hauge, the Board relieved Hauge of his duty as the District's legal officer and his obligation to oversee the Business Office. Hauge viewed that action as a demotion which removed "most of [his] substantive job duties from him."

On December 13, 1999, the Board decided not to renew Hauge's contract beyond June 30, 2000. Hauge contends that the Board failed to state a reason for his termination.

### E. *Procedural History*

On February 25, 2000, Hauge filed a complaint against the Brandywine School District, individual executives within the School District, and individual members of the Brandywine School Board of Education. The original complaint asserted six counts against the defendants including three counts based on alleged violations of constitutional rights and three counts based on alleged violations of state statutory and common law duties. Specifically, Hauge claimed that defendants' acted in a retaliatory manner inconsistent with his First Amendment right to free speech and his Fourteenth Amendment rights to procedural and substantive due process. Hauge further contended that defendants' actions violated the Delaware Whistleblower Statute, 29 *Del. C.* § 5115, breached the duty of good faith and fair dealing inherent in his employment contract, and intentionally caused him to lose his employment contract with the School District.

On March 20, 2000, defendants moved to dismiss the counts of the complaint based on the First and Fourteenth Amendment arguing that the complaint failed to state proper constitutional claims. Further, defendants moved for this court to decline supplemental jurisdiction over the remaining state law claims.

On April 12, 2000, Hauge responded to the motion to dismiss on the pleadings and moved to amend his complaint. This court granted the motion to amend on April 17, 2000. The Amended Complaint added the Board of Education as a defendant and eliminated the contention that defendants' actions violated substantive due process. On April 20, 2000, defendants replied.

On September 26, 2000, prior to oral argument, Hauge notified the court and opposing counsel that he would not pursue his claim that defendants' actions violated

his Fourteenth Amendment right to procedural due process. Thus, Hauge only asserts one constitutional claim, First Amendment retaliation.

## II. *DISCUSSION*

### A. *First Amendment Retaliation Claims*

Hauge contends that the School District demoted him and ultimately refused to renew his contract because he engaged in at least five separate acts protected by the First Amendment:

1. his initial conversation with the State Auditor on October 9, 1998 in which he requested information about accounting firms and disclosed information about Nicholson's purchase of the refrigerator;

2. his subsequent conversations with the State Auditor in October of 1998 in which he updated the State Auditor about the School District's search for an accounting firm, the terms of the accounting firm's engagement, and the additional irregularities that he had uncovered;

3. his conversation with the reporter from the *News Journal* in late February or early March of 1999;

4. his conversation with the State Auditor on March 5, 1999 in which he reported the salary advance to DeJohn's secretary; and

5. his internal memos in which he refused to divulge information regarding the ongoing State Auditor's investigation.

■ Courts employ a three-step test to determine whether a public employee was fired because of his constitutionally protected speech. *See Feldman v. Philadelphia Housing Authority*, 43 F.3d 823, 829 (3d Cir.1994); *Swineford v. Snyder County Pennsylvania*, 15 F.3d 1258, 1269 (3d Cir.1994). First, the plaintiff must show that he engaged in protected speech. *See Pickering v. Board of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

Second, the plaintiff must establish that the speech was a substantial or motivating factor for his discharge. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). If the plaintiff satisfies the first two prongs, then defendants can avoid liability by showing that they would have fired the plaintiff anyway. *Id.*

### 1. *Protected Speech*

Defendants argue that Hauge cannot maintain a proper claim under the First Amendment because he did not engage in protected speech. In evaluating whether or not speech by a public employee deserves constitutional protection, a court must engage in a two-step analysis. First, the court must determine whether, in light of the content, form, and context of the entire record, the speech touched on matters of public concern. *See Connick v. Myers*, 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Feldman*, 43 F.3d at 829; *Swineford*, 15 F.3d at 1270. "An employee's speech addresses public concern when it can be 'fairly considered as relating to any matter of political, social, or other concern to the community.'" *Feldman*, 43 F.3d at 829 (quoting *Connick*, 461 U.S. at 146, 103 S.Ct. 1684). If the employee's speech does not relate to those matters, "government officials should enjoy wide latitude in managing their offices without intrusive oversight by the judiciary in the name of the First Amendment." *Connick*, 461 U.S. at 146, 103 S.Ct. 1684. "Disclosing corruption, fraud, and illegality in a government agency is a matter of significant public concern." *Feldman*, 43 F.3d at 829. Here, defendants do not contest that Hauge's speech touched on matters of public concern. Thus, for purposes of this opinion, the court will assume that Hauge's speech meets this prong of the analysis.

Second, the court must consider whether the government's interest in the effective and efficient management of the School District outweighs Hauge's interest in

commenting on matters of public concern. *See Pickering,* 391 U.S. at 568, 88 S.Ct. 1731. Courts regularly perform this balancing test on motions for summary judgment. Under Rule 56, a court may grant a motion if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. Pro. 56(c). Here, however, the court is considering defendants' motion for a judgment on the pleadings under Federal Rule of Civil Procedure 12(c). Thus, defendants, as the moving party, must overcome a more stringent standard. Under Rule 12(c) the court must view the facts in the pleadings and all reasonable inferences therefrom in favor of Hauge, the nonmoving party.

■ In evaluating what weight to give the defendants' interests the court must determine to what extent Hauge's speech disrupted the effective and efficient workings of the Brandywine School District. Courts have looked to "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin v. McPherson,* 483 U.S. 378, 388, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987) (citing *Pickering,* 391 U.S. at 570–73, 88 S.Ct. 1731). Defendants make two contentions regarding the disruption caused by Hauge's speech. Defendants first argue that as the chief financial officer for the School District, Hauge served as a high-level policymaker within the School District and that courts have routinely stripped speech of First Amendment protection when a high-level public employee takes action in conflict with the directions or policy decisions of his supervisors. Second, defendants contend that because Hauge's speech violated his duties as the School District's legal counsel, he unnecessarily interfered with the

operation of the School District. Thus, defendants argue that Hauge's speech should not be protected under the First Amendment.

First, defendants contend that Hauge's position as the Chief Financial Officer of the Brandywine School District precludes his First Amendment retaliation claim. According to defendants, the School District must have wide latitude to hire and fire employees that have policymaking authority, a high degree of discretion, and a close working relationship with their employer. That is, according to defendants, an employer must be able to fire a high level employee that takes actions in conflict with the directions or policy decisions of their supervisors.

In *Connick,* the Supreme Court stated, "[w]hen close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate." *Connick,* 461 U.S. at 151–52, 103 S.Ct. 1684. But, the Court cautioned, employers will have to make a stronger showing that the office had been disrupted when an "employee's speech more substantially involved matters of public concern." *Id.* The Third Circuit similarly recognized the importance of "the hierarchical proximity of the criticizing employee to the person or body criticized" in applying the *Pickering* balancing test, but stopped far short of identifying a per se exception for policymakers. *See Sprague v. Fitzpatrick,* 546 F.2d 560, 564 (3d Cir.1976). In *Sprague,* the Third Circuit considered whether the district court properly dismissed the action of the former First Assistant District Attorney for Philadelphia County against the District Attorney. Sprague, the First Assistant, claimed that he was discharged because of his criticism of the District Attorney. In evaluating the claim, the court noted that the "First Assistant is the District Attorney's 'alter ego.'" who "assists the District Attorney in formulating policy, is primarily responsible for administration ..., keeps the District Attorney informed about the

performance of the various units in the offices, and acts in the District Attorney's place when the latter is unavailable." *Id.* at 562. Nonetheless, the Third Circuit did not apply a per se exception, but observed that " 'significantly different considerations would be involved' in cases where 'the relationship between superior and subordinate is of such a personal and intimate nature that certain forms of public criticism of the superior by the subordinate would seriously undermine the effectiveness of the working relationship between them.' " *Id.* at 564. Thus, although the Third Circuit placed emphasis on the importance of the nature of the plaintiff's position, it did so within the framework of the *Pickering* balancing test.

The parties dispute the extent to which Hauge had policymaking authority and his proximity within the organizational hierarchy to the School District administrators and the School Board. Under Rule 12(c), the court must view the facts in the light most favorable to the non-moving party, Hauge. Because the court accepts as true Hauge's contention that he had little influence over management decisions and no real policymaking authority, the court will not give defendants' argument any weight on the scales of the *Pickering* balancing test.

Second, defendants contend that Hauge's speech should not be protected by the First Amendment because he disrupted the workings of the School District by violating his ethical obligation as an attorney to keep Brandywine School District's legal issues confidential. According to defendants, Hauge should not have disclosed the School District's financial irregularities to the State Auditor in a series of memos and phone calls and should not have commented to a reporter about the ongoing state audit. *See Goffer v. Marbury,* 956 F.2d 1045 (11th Cir.1992).

In *Goffer,* the Eleventh Circuit determined that violations of attorney-client privilege should be a factor to be considered in the *Pickering* balancing test, but

rejected the argument that a violation of attorney-client confidences would per se override the First Amendment. *See Goffer,* 956 F.2d at 1051. The court reasoned that employers "found to be within the ambit of attorney-client relations have strong (though not overriding) interests in their confidences being protected." *Id.* Further, the court noted that "[t]he existence or not of attorney-client relations also bears on whether there was present the 'close working relationshi[p]' referred to in *Connick* that gives rise to a 'wide degree of deference' to the employer's judgment." *See id.* (*quoting Connick,* 461 U.S. at 151–152, 103 S.Ct. 1684). The Eleventh Circuit found that the district court erred by not providing the jury guidance "for possible application of the defense that Goffer was discharged because she breached confidences arising out of her position as an attorney." *Id.* This court finds that the reasoned and restrained approach of the Eleventh Circuit is in line with the Third Circuit's application of the *Pickering* balancing test.

Like defendants' claim regarding Hauge's authority in the District, the parties dispute the extent to which Hauge served as the School District's attorney. Therefore, the court is again constrained under Rule 12(c) and cannot find that Hauge served as the School District's attorney or that he breached his duty to maintain the School District's confidences. Thus, the court cannot give defendants' argument any weight at this stage of the proceeding. Nonetheless, the court believes that Hauge's role in the School District, his duty to his employers, and his relationship with his superiors remain relevant factors to consider at a later stage of this dispute.

Lastly, defendants argue that Hauge's refusal to disclose the content of his conversations with the State Auditor created an atmosphere of distrust and disharmony. While this is a significant factor for courts to consider, this court notes that the Third Circuit recognizes a strong presumption in

favor of the right to speak. *See Swineford*, 15 F.3d at 1274. Defendants cannot simply state that Hauge's whistleblowing activity caused disruption in the workforce. As the Third Circuit stated,

> the First Amendment balancing test [of *Pickering* ] can hardly be controlled by a finding that disruption did occur. An employee who accurately exposes rampant corruption in her office may disrupt and demoralize much of the office. But it would be absurd to hold that the First Amendment generally authorizes corrupt officials to punish subordinates simply because the speech somewhat disrupted the office .... The point is simply that the balancing test articulated in *Pickering* is truly a balancing test, with office disruption or breached confidences being only weights on the scales.

*Czurlanis v. Albanese*, 721 F.2d at 107 (quoting *Porter v. Califano*, 592 F.2d 770, 773–74 (5th Cir.1979)); *see also Feldman*, 43 F.3d at 830.

In support of his claim that his speech satisfies the *Pickering* balancing test and deserves First Amendment protection, Hauge contends that he has a significant interest in exposing potential fraud and corruption. As the Third Circuit observed, "[s]peech involving government impropriety occupies the highest rung of First Amendment protection." *Swineford*, 15 F.3d at 1274. Moreover, the community maintains an interest in learning of allegations of corrupt practices by public officials. *See O'Donnell v. Yanchulis*, 875 F.2d 1059, 1061 (3d Cir.1989). According to the Third Circuit, "the public has a significant interest in encouraging legitimate whistleblowing so that it may receive and evaluate information concerning the alleged abuses of ... public officials." *Id.* at 1062.

Hauge argues that any disruption he caused the School District resulted from his duty to the State of Delaware and the natural outgrowth of his work to bring potential fraud to light. According to Hauge, Delaware law, 29 Del. C. § 2906(c),

required him to contact the State Auditor with questions about the selection, engagement, and progress of an accounting firm hired to perform an audit of the School District. The plain language of this statute does not appear to require Hauge to contact the State Auditor for audits other than the "agency postaudit." However, the parties have not briefed the importance of this section and on a motion for judgment on the pleadings, the court will assume that Hauge contacted the State Auditor in good faith.

Second, Hauge claims that his conversation with the reporter from the *News Journal* merely confirmed that he had contacted the state auditor and did not include any discussion of the allegations. Lastly, Hauge claims that any disruption felt by the School District as a result of Hauge's communication regarding the salary advance DeJohn provided his secretary is incidental to the disclosure of potential fraud. Thus, because of his interest in the speech and the interest of the community in learning about potential government fraud, Hague contends that his communications with the State Auditor cannot be stripped of First Amendment protection.

Given the value the Third Circuit places on free speech and exposing potential corruption in the government, at this stage of the proceeding the court finds that Hauge's and the community's interests in his speech outweigh any disruption that Hauge may have caused the efficient and effective management of the School District. Therefore, the court will deny defendants' motion to dismiss Hauge's First Amendment retaliation claim.

### 2. *Qualified immunity*

The individual defendants argue that they are entitled to qualified immunity from suit for any alleged violation of Hauge's First Amendment rights. Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from lia-

bility for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). As a threshold question, courts evaluating claims of qualified immunity must first determine whether the plaintiff properly alleges a constitutional violation. *See Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991) ("A necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is 'clearly established' at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all."); *Gruenke v. Seip,* 225 F.3d 290, 298–290 (3d Cir.2000) ("[The court's] first task is to assess whether the plaintiff's allegations are sufficient to establish the violation of a constitutional or statutory right at all."). For the reasons stated above, the court finds that Hauge has sufficiently alleged a constitutional right to free speech.

After answering this threshold inquiry, the court must determine whether defendants' conduct violated a clearly established right. *See Siegert,* 500 U.S. at 232, 111 S.Ct. 1789; *Good v. Dauphin County Social Servs. for Children and Youth,* 891 F.2d 1087, 1091–92 (3d Cir.1989). The Third Circuit has broken this inquiry into two separate questions. First, the court must determine whether the right has been clearly established. "[I]n order for the governing law to be sufficiently well established ... it is not necessary that there have been a previous precedent directly in point. Some but not precise factual correspondence to precedent is necessary for the defendant to be charged with knowledge of the unlawfulness of his or her actions." *Good,* 891 F.2d at 1092 (quotations omitted); *see also Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Second, the court must determine whether the officials are entitled to immunity despite a clearly recognized right. *See Good,* 891 F.2d at 1092

("[E]ven if the officials clearly should have been aware of the governing legal principles, they are nevertheless entitled to immunity if based on the information available to them they could have believed their conduct would be consistent with those principles.").

The Supreme Court and Third Circuit have spoken with particularity about the contours of a public employee's right to speak under the First Amendment. While each case requires a fact-intensive approach, it is clear that a public employer may not fire an employee for disclosing alleged fraud and corruption. Given the fact-intensive nature of the *Pickering* balancing test, however, the right is not clearly established such that the individual defendants should have known whether their conduct violated Hauge's First Amendment rights. Therefore, the court will grant the individual defendants' motion for qualified immunity.

### B. *State Law Claims*

■ Defendants argue that this court should decline jurisdiction over Hauge's state law claims. Congress provided "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action ... that they form part of the same case or controversy ...." 28 U.S.C. § 1367(a). Under 28 U.S.C. § 1331, this court has original jurisdiction over Hauge's § 1983 claim of a violation of his First Amendment rights. Defendants cannot and do not contest that Hauge's state law claims are not part of the same case or controversy; therefore, this court may exercise jurisdiction over Hauge's related state law claims.

Nonetheless, defendants claim that given the lack of merit of Hauge's federal claims, it is within the discretion of this court to decline jurisdiction. Section 1367(d) states that

The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if—

(1) the claim raises a novel or complex issue of State law;

(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

Defendants cannot avail themselves of any of these exceptions. First, this court has denied the motion to dismiss Hauge's federal constitutional claims. Second, although it is a preference of federal courts to reach statutory claims before constitutional claims, the court may ultimately have to decide this case by interpreting the Delaware Whistleblower Statute. The facts of this case, however, do not provide "novel or complex issues of State law;" nor do the state law claims dominate the First Amendment claims. Thus, the court will deny defendants' motion to dismiss the counts of Hauge's complaint based on Delaware law.

## III. *CONCLUSION*

For the reasons set forth above, the court hereby denies defendants' motion for judgment on the pleadings with respect to Hauge's First Amendment retaliation claim. Further, the court will deny defendants' motion to dismiss related state law claims. The court will grant the individual defendants' motion for qualified immunity.

The court will enter an order consistent with this opinion.