**[J-39A-2021 and J-39B-2021] [MO: Donohue, J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

| | | |
|---|---|---|
| IN THE INTEREST OF: Y.W.-B., A MINOR | : | No. 1 EAP 2021 |
| | : | |
| | : | |
| | : | Appeal from the Order of Superior |
| APPEAL OF: J.B., MOTHER | : | Court entered on October 8, 2020 at |
| | : | No. 1642 EDA 2019 affirming and |
| | : | reversing the Order entered on June |
| | : | 11, 2019 in the Court of Common |
| | : | Pleas, Philadelphia County, Family |
| | : | Division at No. CP-51-DP-0002108- |
| | : | 2013. |
| | : | |
| | : | ARGUED: May 19, 2021 |
| | | |
| IN THE INTEREST OF: N.W.-B., A MINOR | : | No. 2 EAP 2021 |
| | : | |
| | : | |
| | : | Appeal from the Order of Superior |
| APPEAL OF: J.B., MOTHER | : | Court entered on October 8, 2020 at |
| | : | No. 1643 EDA 2019 affirming and |
| | : | reversing the Order entered on June |
| | : | 11, 2019 in the Court of Common |
| | : | Pleas, Philadelphia County, Family |
| | : | Division at No. CP-51-DP-0002387- |
| | : | 2016. |
| | : | |
| | : | ARGUED: May 19, 2021 |

## CONCURRING AND DISSENTING OPINION

**JUSTICE DOUGHERTY**                    **DECIDED: December 23, 2021**

I concur in the result. Specifically, I agree with the majority's conclusion the juvenile court's order directing appellant to comply with a child welfare home safety assessment lacked a sufficient basis, and the Superior Court therefore erred in concluding the record supports a finding of probable cause. I appreciate the majority's scrupulous attempt to pronounce clear parameters of probable cause around the domain

of child protection, where bright-line standards are scarce, and I underscore my thorough agreement with the majority's conclusion the facts of this record do not establish probable cause under any type or quantum of evidence. However, I view substantial elements of the majority's reasoning as incongruous, and potentially deleterious to the development of more context-specific, and arguably more appropriate, jurisprudence. But, upon this record of insufficient facts, the majority makes significant pronouncements of child welfare law and practice regarding issues neither properly before this Court nor, in my view, necessary for resolution of this case; these statements may hamper county agencies' ability to effectively assess and serve vulnerable families. I therefore dissent from the majority's analysis.

There is no dispute here regarding whether the Child Protective Services Law (CPSL) and the related regulations governing the Department of Human Services and county children and youth agencies must be enforced within the constitutional limits imposed by the Fourth Amendment to the United States Constitution. The parties, the lower courts, over a decade of jurisprudence governed by the Superior Court's decision in *In re Petition to Compel Cooperation*, 875 A.2d 365 (Pa. Super. 2005), and each of the federal circuit courts confronting constitutional claims related to child protection investigations,[1] all agree the Fourth Amendment's protection against unreasonable searches requires a showing of reasonable government need to compel inspection of a home by an agency acting under a child protection statute. We ostensibly granted discretionary review to consider whether the Superior Court below granted the

---

[1] *See, e.g., Wojcik v. Town of N. Smithfield*, 76 F.3d 1 (1st Cir. 1996); Tenenbaum v. Williams, 193 F.3d 581 (2d Cir. 1999); *Good v. Dauphin Cty. Soc. Servs. for Children & Youth*, 891 F.2d 1087, 1093 (3d Cir. 1989); *Wildauer v. Frederick Cty.*, 993 F.2d 369, 372 (4th Cir. 1993); *Roe v. Tex. Dep't of Protective & Regulatory Servs.*, 299 F.3d 395, 407-08 (5th Cir. 2002); *Doe v. Heck*, 327 F.3d 492 (7th Cir. 2003); *Calabretta v. Floyd*, 189 F.3d 808 (9th Cir. 1999); *Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1240-42 (10th Cir. 2003).

Philadelphia Department of Human Services (DHS) "sweeping authority to enter and search a private home" in violation of state and federal constitutional protections, allegedly without a link between the General Protective Services (GPS) report and anything particular inside the home. *Interest of Y.W.-B.*, 243 A.3d 969, 969-70 (Pa. 2021) (*per curiam*). But, the question of what measure of probable cause applies to an administrative search sought by an agency performing a child protection investigation is an issue of first impression for this Court, and the arguments advanced by the parties actually focus on whether the record before the trial court provided a basis to meet any standard of probable cause at all.[2]

## I.    The Superior Court's decision in *Petition to Compel*

The thorny issue we confront here was previously considered by the Superior Court in *Petition to Compel*. The question before that court was broad: whether constitutional protections against unreasonable searches applied at all to home

---

[2] Preliminarily, the question of whether appellant preserved her state law claim under Article I, Section 8 of the Pennsylvania Constitution circumscribes the scope of my analysis. Although, as the majority indicates, appellant claimed a violation of both federal and state provisions in the trial court and Superior Court, *see* Majority Opinion at 9-10 n.10, appellant's contention in this Court is that the Pennsylvania Constitutional provision affords greater protection than the Fourth Amendment does, and consequently certain probable cause exceptions developed under the federal law do not apply. *See* Appellant's Brief at 42-54, *citing, inter alia, Commonwealth v. Edmunds*, 586 A.2d 887, 888, 897-98 (Pa. 1991) (declining to adopt federal good-faith exception to the exclusionary rule). However, DHS argues appellant's expansion-of-protection argument is waived under *Commonwealth v. Bishop*, 217 A.3d 833, 840-42 (Pa. 2019), in which we held preservation of a claim seeking departure from federal constitutional law requires an appellant to assert and develop — to the trial court and on intermediate appeal — why the state constitutional provision at issue should be interpreted more expansively than its federal counterpart. Here, appellant did not do so, and, consistent with *Bishop*, I therefore view her departure claim as waived, and regard her state law claim as coterminous with a claim under the Fourth Amendment. *Id.* at 838, 841. As a result, to the extent necessary for resolution of this case, I view federal Fourth Amendment jurisprudence, and our cases interpreting Article I, Section 8 as coterminous with its federal counterpart, as appropriate binding precedent.

inspections sought by a children and youth agency pursuant to the CPSL. *See Petition to Compel*, 875 A.2d at 374. Noting the absence of Pennsylvania law on the subject, the panel in *Petition to Compel*, like the majority in the present case, drew significant guidance from *Good v. Dauphin County Social Services for Children and Youth*, 891 F.2d 1087 (3rd Cir. 1989), and *Walsh v. Erie County Department of Job & Family Services*, 240 F. Supp. 2d 731 (N.D. Ohio 2003), both federal cases, respectively reversing and denying summary judgment on Section 1983 civil rights claims regarding child protection searches performed without a warrant.[3] *Id.* at 375-79. *Good* and *Walsh* each held the Fourth Amendment applied to the searches performed under child protection statutes, although neither addressed the merits of a claim probable cause was lacking, nor did they consider situations where a warrant had issued or a pre-deprivation hearing had been held. Observing, based upon *Good* and *Walsh*, that Fourth Amendment and Article I, Section 8 principles applied to child protection investigations, as well as the primacy of the privacy interest in one's home, and the agency had provided only a single allegation of medical neglect unconnected to the child's home environment, the *Petition to Compel* panel vacated the lower court's *ex parte* order granting the home inspection. The panel pronounced as the law of the Commonwealth that constitutional protections against unreasonable searches require a children and youth agency to "**file a verified petition alleging facts amounting to probable cause to believe that an act of child abuse or**

---

[3] *See* 42 U.S.C. §1983. Though effective for answering the broad question then before the panel in *Petition to Compel*, the utility of these federal cases accedes to some important limits discussed *infra*, *i.e.*, they assume the truth of the plaintiffs' allegations of objectively egregious conduct (an assault by police to compel an investigation of poor housekeeping in *Walsh*, and a strip search based upon an anonymous report of bruises in *Good*), and determine the agents were not entitled to qualified immunity, because a factfinder could conclude the government actors performing the searches could not reasonably believe they had authority to search plaintiffs' homes without a warrant or on the basis of exigency. *See Good*, 891 F.2d at 1095-96; *Walsh*, 240 F. Supp. 2d at 744, 749-50, 758-60.

**neglect has occurred and evidence relating to such abuse will be found in the home**." *Petition to Compel*, 875 A.2d at 377 (emphasis added). The panel's rationale and holding are endorsed by the majority and both parties in the present appeal. *See* Majority Opinion at 30-32, Appellant's Brief at 39-40, Appellee's Brief at 16, 22 n.3.

I make these observations regarding *Petition to Compel* in response to appellant's central claim the rule of law articulated by the Superior Court's decision below allows for a sweeping, unlimited search of a private home "not compatible with Fourth Amendment jurisprudence" because the court failed to confine its holding to the particular definition of "general protective services" provided in the CPSL regulations. Appellant's Brief at 15-16, 20-21, 32, 40-41, 53. The "rule of law" to which appellant refers is a nearly word-for-word reiteration of the accepted "rule of law" from *Petition to Compel*: "an agency may obtain a court order compelling a parent's cooperation with a home visit **upon a showing of a fair probability that a child is in need of services, and that evidence relating to that need will be found inside the home**." *Id.* at 16-17; *Interest of Y.W.-B.*, 241 A.3d 375, 386 (Pa. Super. 2020) (emphasis added), *citing Petition to Compel*, 875 A.2d at 377-78. In adapting this minimally-nuanced version of the holding from *Petition to Compel* regarding a child abuse investigation under the CPSL, to the type of "general protective services" assessment involved in this case, the panel below explicitly incorporated this Court's definition of "probable cause," as well as the CPSL's definition of "general protective services" and relevant regulations. *See id.* at 383-84*, quoting*, *inter alia*, *Commonwealth v. Jones*, 988 A.2d 649, 655 (Pa. 2010) (defining "probable cause" as a common-sense determination of "fair probability" evidence would be found in a particular place); *id.* at 384, *quoting* 23 Pa.C.S. §6303(a) (defining "general protective services" as "'[t]hose services and activities provided by each county agency for cases requiring protective services, as defined by the department in regulations'") and 55 Pa. Code

§3490.223 (further defining "general protective services"); *id.* at 384 n.8, *quoting* 55 Pa. Code §3490.4 (defining "protective services" to include child abuse and general protective services). It therefore appears appellant's entire argument takes the Superior Court's reference to a child "in need of services" fully out of context, and appellant would be satisfied if the panel instead had merely referred more explicitly to a child "in need of **protective** services." Consequently, I view appellant's challenge to the Superior Court's "rule of law", which comprises the issues upon which we granted allocatur, as without merit.

I further observe that neither DHS nor its *amicus* argues in favor of implementing the "social worker exception to the Fourth Amendment" the majority rejects. Relatedly, I cannot agree with the majority's casting of Judge Beck's famous concurring opinion in *Petition to Compel* — joined, notably and unusually, by both panel members in the majority — as generally irrelevant, aside from its recognition the facts supporting probable cause for a home inspection will likely be different from those in a criminal investigation. Majority Opinion at 32-33. In my view, the Beck Concurrence potently declared "simply requiring an agency to show 'probable cause' as it is defined in the criminal law **is not enough**[,]" and encouraged close consideration of the nature and context of each scenario, along with the fullest of all possible disclosures of relevant information by children and youth agencies requesting to compel a home inspection, in light of the significantly different purposes and goals of child protection versus those of law enforcement. *Petition to Compel*, 875 A.2d at 380 (Beck, J., concurring) (emphasis added).

Thus, I would not minimize the significance of the Beck Concurrence. Judge Beck's astute warning to avoid applying "the standard notion of probable cause in criminal law" to child protection cases is not without authoritative support, and indeed, it reflects

important, diverging federal court probable cause jurisprudence involving non-criminal investigations. *See*, *e.g.*, *Griffin v. Wisconsin*, 483 U.S. 868, 873, 875-76, 877-78 & nn.4 & 6 (1987) (administrative search requires reasonableness only, rather than quantum of concrete evidence to support probable cause; warrantless search of probationer's home was reasonable where state's Department of Health and Social Services regulatory scheme provided "special needs" for the supervision of a special population "beyond the normal need for law enforcement[ which] make the warrant and probable-cause requirement impracticable"), *quoting New Jersey v. T.L.O.*, 469 U.S. 325, 351 (1985) (Blackmun, J., concurring); *Ferguson v. City of Charleston*, 532 U.S. 67, 68, 79-80 (2001) (warrantless, suspicionless search fits "special needs" exception only when "divorced from the State's general interest in law enforcement"); *Darryl H. v. Coler*, 801 F.2d 893, 901 (7th Cir. 1986) (because discretion of caseworker was circumscribed by regulatory standards and child could refuse to cooperate, child abuse investigation including inspection of child's body could be conducted without meeting the strictures of probable cause or warrant requirement); *Tenenbaum v. Williams*, 193 F.3d 581, 604 (2d Cir. 1999) (noting possibility of "special needs" circumstances where warrant and probable cause would not effectively protect child); *Franz v. Lytle*, 997 F.2d 784, 791 (10th Cir. 1993) ("critical distinction[]" between social work and law enforcement "justifies a more liberal view of the amount of probable cause that would support an administrative search").

Similarly, I view the distinct features of the individualized and intimately fact-sensitive civil administration of the CPSL, as compared to the strictly-prescribed principles of criminal law and procedure utilized to enforce the Crimes Code, as important considerations — not for the purpose of excusing a proper showing of reasonable or probable cause — but to competently balance risks of harm to the vulnerable child and

the sacrosanctity of the family home.[4]  After all, despite well-established Fourth Amendment standards developed through criminal law, we nevertheless continue to pronounce often fine-grained distinctions between assessments of probable cause necessary to support an arrest (where the conclusion concerns the guilt of the arrestee), and probable cause to search (where the conclusions concern the present location of items sought and their connection with a crime), as well as the not-quite probable cause (*i.e.*, a reasonably articulable suspicion) required to perform an investigatory stop and subsequent search.  *See Terry v. Ohio*, 392 U.S. 1; 20-27 (1968) (reasonable suspicion affords "due weight" to "specific reasonable inferences which [an officer] is entitled to draw from the facts in light of his experience"; however, "good faith" and "inarticulate hunches" are insufficient support); *see also*, *e.g.*, *Commonwealth v. Hicks*, 208 A.3d 916, 925, 940, 946 (2019) (applying *Terry*, investigative stop based on officer's "inchoate and unparticularized suspicion or hunch" did not satisfy reasonable suspicion standard) (internal quotations omitted).

I further note the contours of an appropriate Fourth Amendment analysis are, to some extent, shaped by the General Assembly's intentional enactments of specialized laws, with their particularly-defined purposes and elements, which must be considered when determining whether an adequate quantum of evidence supports the requested invasion of privacy.  *See Hicks*, 208 A.3d at 954 (Dougherty, J., concurring), *quoting Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (where legislature exercises its exclusive power to pronounce which acts are crimes and define them, "it is the elements of those crimes that officers must consider when determining whether there is 'reasonable,

---

[4] The majority criticizes my analysis here as failing to indicate what evidence might be required to establish probable cause in the child welfare context.  *See* Majority Op. at 34-35 n.18.  I reiterate that I do not dispute there was insufficient evidence presented in this case, and also note that I describe several examples to this effect *infra*, in Section IV of this opinion.

articulable suspicion that criminal activity is afoot'"). The Beck Concurrence did not further expound upon the parameters of probable cause in cases arising under the CPSL, perhaps due to the panel's unanimous agreement regarding the dispositively insufficient record before it. But, in my respectful view, Judge Beck foresaw the pernicious allure of applying our existing, well-developed criminal law rubric within the context of a child welfare investigation — exemplified by several problematic assumptions and conclusions relied upon throughout the majority's analysis in this case — which risks arriving at incorrect, plausibly dangerous results.

## II. Criminal law and child protection distinctions

The criminal law standards relied upon by the majority, *see* Majority Opinion at 17-19, address the constitutional probable cause requirements for obtaining an ***ex parte warrant*** to search for **specific evidence** of **criminal activity** to be **seized for use in proving a crime**. Analogy to the customized procedural and substantive requirements developed in response to these particular features of criminal search warrants may be all that exists in the Commonwealth's jurisprudence to aid our analysis here, but, in my view, it is at best an approximate, awkward fit.

### A.

First, and foremost, the CPSL is not a criminal statute. It is a civil law statute administered by the Pennsylvania Department of Human Services (the Department) to implement and regulate a program of child protection with the stated purpose of, *inter alia*, "providing rehabilitative services for children and parents involved so as to ensure the child's well-being and to preserve, stabilize and protect the integrity of family life wherever appropriate[.]" 23 Pa.C.S. §6302(b). "It is the goal of children and youth social services to ensure for each child in this Commonwealth a permanent, legally assured family which protects the child from abuse and neglect." 55 Pa. Code §3130.11. "The

primary purpose of general protective services is to protect the rights and welfare of children so that they have an opportunity for healthy growth and development." 23 Pa.C.S. §6374(a). "Implicit in the county agency's protection of children is assistance to parents in recognizing and remedying conditions harmful to their children and in fulfilling their parental duties more adequately." *Id.* §6374(b). To that end, each county is responsible for administering a program of children and youth social services that provides, *inter alia*, "[s]ervices designed to keep children in their own homes; prevent abuse, neglect and exploitation; and help overcome problems that result in dependency and delinquency[;]" and "[s]ervices designed to reunite children and their families" if circumstances require the child's removal. 55 Pa. Code §§3130.12(c), 3490.231; 23 Pa.C.S. §6373. Of course, referrals to law enforcement may at times arise in such situations, but, fundamentally, an investigating caseworker is not law enforcement. As well, although there might naturally be some resistance to a protective services investigation, the caseworker's purpose and duty is to render the services necessary to keep children safe in their own homes. *See id.*

Unlike our expansive crimes code and detailed Rules of Criminal Procedure, which together define every possible offense requiring law enforcement with strictly-construed precision and delineate their consequences and warrant procedures, the CPSL defines only two circumstances authorizing an agency's unwanted involvement in family privacy: when the child is in need of either "child protective services" as a result of child abuse, or "general protective services" to address additional needs related to potential for harm, such as neglect. Each of these is broadly defined, and their concepts and protocols overlap. For example, beyond solely intentional injuries, child abuse calling for "child protective services" may include omissions in care which create a likelihood of injury, cause physical neglect (including failure to provide age-appropriate supervision), or

contribute to a child's mental illness. *See* 23 Pa.C.S. §6303. "General protective services" are those provided by each county agency "**for cases requiring protective services**, as defined by the [D]epartment in regulations[,]" *id.* (emphasis added); the corresponding regulations' definition of "protective services" encompasses services **both** to "children who are abused" **and** those "in need of general protective services[,]" 55 Pa. Code §3490.4.[5]

The term "general protective services" includes, most broadly, "[s]ervices to prevent the potential for harm to a child who [*inter alia*] [i]s without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals[,]" *id.* §3490.223. Consequently, a child may be **both** the subject of a child protective services report, **and also** in need of general protective services. A report of suspected child abuse received by Childline may, after its initial screening, be assigned to the county agency for assessment as a GPS report, and a family may also be accepted for general protective services following an unfounded "CPS" (*i.e.*, child protective services) investigation; conversely, a report screened-in as meeting GPS criteria may, after assessment, be transitioned to a CPS case for a child abuse investigation. *See* 23 Pa.C.S. §6334(f); 55 Pa. Code §§3490.32(g), 3490.59(a), 3490.235(a) ("The county agency shall provide, arrange or otherwise make available the same services for children in need of general protective services as for abused children[.]"); PA. DEP'T OF HUM. SERVS., OCYF Bull. No. 3490-20-08, STATEWIDE GEN. PROTECTIVE SERVS. (GPS) REFERRALS, at 2 (Sept. 11, 2020) (referencing guidelines for transitioning reports originally assigned as GPS reports to CPS reports). Furthermore, a report of possible neglect based on, for example, a reporter's observation a child is

---

[5] *See also* 23 Pa.C.S. §6303 (defining "protective services" as [t]hose services and activities provided by the department and each county agency for children who are abused **or** are alleged to be in need of protection under [the CPSL]") (emphasis added).

unbathed, hungry, and unsupervised, may fit either category or none at all, depending not only upon the veracity of the particular details provided by the reporter (or lack thereof), but also the agency's ability to understand the circumstances — *e.g.*, the child's age and ability, whether the incident is isolated, or if there is evidence of further or different maltreatment[6] — and assess for safety threats and level of risk. *See* 23 Pa.C.S. §§6362(e), 6375(c)(2) (requiring use of Department-approved risk assessment process to evaluate both CPS and GPS cases); 55 Pa. Code §3490.321 (providing standards for Department-approved risk assessment processes).[7]

---

[6] Research compiled by the United States Department of Health and Human Services indicates children experiencing one form of maltreatment may experience others simultaneously and are likely to experience recurring neglect. CHILDREN'S BUREAU, U.S. DEP'T OF HEALTH & HUM. SERVS., CHILD MALTREATMENT 2019 20-22 (2019), https://www.acf.hhs.gov/sites/default/files/documents/cb/cm2019.pdf.

[7] The majority dilutes my disagreement with its statutory analysis by imprecisely characterizing it as merely based upon "overlap in the definitions of 'child abuse' and 'child neglect.'" Majority Op. at 48 n.23. But my dissent in this regard stems not only from the particular definitions of these (unquestionably important) terms, but from the malleable, transferable, **context-specific** concepts relating to the **type of protective services** (*i.e.*, CPS or GPS) employed at a given time in a given case as a result of an agency's screening, assessment, or investigatory process — which, by statute and by regulation, is neither static nor dependent upon the information supplied by the reporter.

Of course, this statutory and regulatory scheme is significantly more complex than the summary review I provide herein. Its adaptability to an agency's improved understanding of the child's and family's needs is a critical feature which, in my respectful view, is dangerously oversimplified by the majority's use of regulatory provisions divorced from context to define the services an agency must provide based on how the report is made. *See id.*; *see also id.* at 16. Even a report as seemingly anodyne as potentially failing to feed a child for eight hours while outside could prove dire in the case of a very young infant or other especially vulnerable child; such a report is just as readily an allegation the child is without care necessary for his physical health — *i.e.*, GPS report criteria, *see id.* at 16, *quoting* 55 Pa. Code §3490.223 — as it is reasonable cause to suspect the child's development is endangered by his caregiver's failure to provide the essentials of life — *i.e.*, CPS report criteria, *see id.*, *quoting* 55 Pa. Code §3490.11(a); *id.* at 48 n.23, *citing* 55 Pa. Code §3490.4 (defining child abuse as including "serious physical neglect"). Additionally, I note the statutory definition of "serious physical neglect," differs from the regulatory definition described by the majority, and includes, as forms of child abuse, the failure to supervise a child in a manner appropriate for the child's development and

Recognizing the Court must render its decision in this case without the contextual aid of any record development regarding the foundations of the agency's administrative or investigatory protocols and risk assessment calculus, I note responsibility for the particulars of how these screening and assessment practices are employed has been delegated to the Department by the General Assembly. *See id*; 23 Pa.C.S. §6303 (defining "[r]isk assessment" as "[a] Commonwealth-approved systematic process that assesses a child's need for protection or services based on the risk of harm to the child"); 55 Pa. Code §3490.321(b) ("The Department and counties will review the implementation of the risk assessment process on an ongoing basis to ensure that the standards established are consistent with good practice and the results of research."); *id.* §3490.321(c) ("The county agency shall implement the State-approved risk assessment model developed by the Department in consultation with the Risk Assessment Task Force."). In this vein, the agency must have some discretion in translating the information supplied by a reporter, along with any other information revealed through its own screening and assessment processes, into risk assessment categories such as "homelessness" and "inadequate basic care."[8]

---

abilities, as well as failure to provide a child with adequate essentials of life — "including food, shelter or medical care," without regard for whether such deprivation is "prolonged or repeated" as the majority insists. 23 Pa.C.S. §6303(b.1).

[8] Guidance from the Pennsylvania Department of Human Services' Office of Children, Youth and Families provides subcategories of need to be used for the dual purposes of identifying the primary concerns to address and allowing for consistent tracking of data. *See* PA. DEP'T OF HUM. SERVS., OCYF Bull. No. 3490-20-08, STATEWIDE GEN. PROTECTIVE SERVS. (GPS) REFERRALS, at 8 (Sept. 11, 2020). The subcategories, which include "homelessness" and "inadequate basic needs" related to clothing/food/hygiene, education, health care, nurturing/affection, and shelter/housing, are not exhaustive or rigidly applied, but "nuanced" examples are "provided solely to give direction to staff[.]" *Id.* at 8, 10-11.

Here, I am troubled by the majority's parsing of the information supplied by the reporter and the categories of risk identified by DHS without regard for the Department's evidence-based process. *See id.* §3490.321(b), *supra.* Specifically, I disagree with the majority's conclusion the DHS caseworker's testimony — that she located the family's address and observed the arrival of appellant and the children — "confirmed" the family was not homeless, and thus any risk of homelessness was "rendered moot." Majority Opinion at 39. First, I note that, while the Petition to Compel Cooperation (Petition) indicates appellant ushered the children into the home while DHS was there, the caseworker herself specifically refuted making that observation, as follows:

> [Appellant's counsel] Q. You testified that the allegations were homelessness and inadequate care. You said you went out to the home; is that correct?
>
> [DHS] A. I went out to the home; yes, I did.
>
> Q. You saw the family go into a home?
>
> A. No, I did not. We were standing outside the entire time.
>
>           *      *      *
>
> Q. The facts alleged in the petition are that the father was at the home, and that the mother arrived at the home shortly after that and ushered the children into the home; is that correct?
>
> A. I do not recall that, no.
>
> Q. All right. I think your counsel can show you a copy of the petition? Were you there?
>
> A. That's fine, but I -- I filed the petition, and I recall being with the family, and that's not what occurred. So, something could be in the petition, but that's not what I stated.
>
> Q. The petition might be false?
>
> A. That could be. It could be a mistake, but that's not what occurred.
>
> Q. All right. You have an address that you went out to; is that correct?
>
> A. Yes, I did.
>
> Q. Was the family living at that address?
>
> A. I have no idea if they were living at the address because I was not allowed access into the home.

N.T. 6/11/2019 at 8-10; *see also* Petition to Compel Cooperation, 5/31/2019, at ¶ 3(l). Second, other nonconflicting evidence indicates the address was the same residence known to DHS and the trial court from appellant's prior dependency matter, which was confirmed by the caseworker through a public welfare records search. *See* N.T. 6/11/2019 at 9-12; Petition at ¶ 3(k). But there is nothing in the record to confirm that any person did or could occupy or enter the address prior to DHS's completion of its court-ordered home assessment. In my view, just as the Court cannot affirm a finding of probable cause on these scant facts, the Court should not conclusively terminate, as a matter of law, a fact-intensive DHS investigation where more information may be available, but the evidence presented in the midst of an investigation is insufficient to warrant home entry. An individual's presence at the address on file for public welfare purposes, without more, is not proof the address is habitable or that she lives there. Likewise, I disagree with the majority's dismissal of DHS's identified concern for "inadequate basic care" as "hyperbole," and its determination that the "only potentially viable allegation" remaining (after ruling out homelessness) was an anonymous report one child may not have been fed over a period of several hours during a protest event which had no connection to conditions of the home. Majority Opinion at 38-41. Regardless of whether appellant did or did not feed the child that day, safe and habitable shelter remains an essential aspect of providing "basic care" to a child. *See supra* n.7.

B.

Although reports provided by mandated reporters must include the reporter's identity and a presumption of good faith, *see* 23 Pa.C.S. §§6313(b)(8), 6318(c), the CPSL also encourages "[a]ny person" to make a report "if that person has reasonable cause to suspect that a child is a victim of child abuse[,]" *id.* §6312; *see also id.* §6302 (one purpose of CPSL is "to encourage more complete reporting of suspected child abuse"). The

agency must accept and screen all reports "regardless of whether the person identifies himself." 55 Pa. Code §3490.11; *see also id.* at §3490.54 (agency "shall investigate and make independent determinations on reports of **suspected** child abuse" "regardless of whether or not the person making the report identified himself") (emphasis added). As a result, even anonymous or nonspecific reports are where an agency's investigation must begin. Unlike law enforcement, caseworkers do not police and patrol; their investigations do not typically start with knowledge of any objective facts, as law enforcement does when a crime occurs. *See, e.g., E.Z. v. Coler*, 603 F. Supp. 1546, 1559-60 (N.D. Ill.1985) ("When police are investigating a crime, investigation is generally after the fact and no immediate threat to the life of a dependent child is present. . . . [R]equiring child abuse investigators to meet a probable cause standard or obtain a warrant ignores the difficulty of collecting any evidence other than anonymous tips and unverified reports in child abuse investigations."), *aff'd sub nom., Darryl H. v. Coler*, 801 F.2d 893 (7th Cir. 1986). Similarly, the respective roles of confidential informants in police investigations and anonymous reporters of child maltreatment are not equivalent. A confidential informant receives some benefit based on the level of detail and reliability of information provided in cooperation with the police. A reporter's reliability does not stem from his relationship with the investigator, however, but from his relationship to the child and family — requiring careful balancing to preserve that relationship, for the sake of the child and family as well as the investigation — and, as a result, may trigger greater reluctance to provide details, including his identity.

For these reasons and others, I disagree with the majority's determination DHS has no basis to maintain the confidentiality of a reporter whose unsolicited information at the starting point of an investigation is categorized by the agency as fitting GPS criteria as opposed to CPS criteria, a distinction with plausibly no difference in some cases. *See*

23 Pa.C.S. §6332 ("The department shall establish a single Statewide toll-free telephone number that all persons, whether mandated by law or not, may use to report cases of suspected child abuse or children allegedly in need of general protective services."); *but see* Majority Opinion at 46-47. Nor do I agree the General Assembly "has drawn a clear distinction between an individual who makes an anonymous report of child abuse as opposed to one of child neglect." *Id.* at 47. As explained *supra*, the CPSL's definition of child abuse **includes** types of neglect, and the decision to assign a report as GPS or CPS belongs to the Department or agency staff performing the intake screening, not the lay reporter. *See supra* n.7; *see also* 23 Pa.C.S. §§6334, 6362; 55 Pa. Code §3130.31. It thus seems quite plausible that the CPS and GPS distinctions are not clear enough to require the confidentiality of one reporter but not the other, and the contrary conclusion appears antithetical to the CPSL's express purpose of encouraging more complete reporting of any and all child abuse. *See* 23 Pa.C.S. §6302. More importantly, however, the majority's sweeping judgment in this regard is a departure from the Department's stated practice,[9] and will have consequences for incident reporting across the Commonwealth. And, even more problematic, the issue is not one squarely before us for review. To the extent the parties do argue the issue, the majority accepts appellant's position, but does not address the reasonable counter-argument of DHS. DHS observes CPSL subsection 6375(o) mandates "[i]nformation related to reports of a child in need of general protective services shall be available to individuals and entities to the extent they are authorized to receive information under [S]ection 6340[,]" and Section 6340(c) protects the identity of the person making a report "of **suspected** child abuse." Appellee's Brief at 38-39, *citing* 23 Pa.C.S. §§6340, 6375(o) (emphasis added). Although the

---

[9] *See* PA. DEP'T OF HUM. SERVS., PERMISSIVE REPORTERS: FREQUENTLY ASKED QUESTIONS, https://www.dhs.pa.gov/KeepKidsSafe/Clearances/Documents/FAQ_Permissive%20Re porter.pdf (last visited December 17, 2021).

reporter's testimony may well have shed some light, it may simply be that the reporter was anonymous, in which case DHS would not have known the reporter's identity, let alone called upon him or her to testify. In any event, the majority's rule eradicating a reporter's confidentiality appears neither appropriate nor necessary in the context of this case. [10]

C.

One of the few objective tools available to agencies performing an initial assessment or investigation is to obtain the family's prior history of agency involvement, which the regulations require. *See* 55 Pa. Code §3490.321(e)(1) ("[F]actors which shall be assessed by the county agency include . . . the history of prior abuse and neglect."). "Simply put, as the frequency of known prior abuse/neglect increases, so does the risk of harm to the child." PA. CHILD WELFARE RES. CTR., UNIV. OF PITTSBURGH, A REFERENCE MANUAL FOR THE PENNSYLVANIA MODEL OF RISK ASSESSMENT 22 (2015).[11] However, the mere existence of a previous report is not dispositive of a high degree of risk; other important factors include, *inter alia*, the quantity and quality of the previous incidents, the abilities of the child and parent, and whether the severity of risk has increased over time.

---

[10] The majority misconstrues my disagreement with its analysis of a reporter's confidentiality as a disagreement with its statutory analysis of CPSL Subsection 6340(c). *See* Majority Op. at 48 n.23. Though I have highlighted here several textual and practical reasons one might disagree with the substance of the majority's review of this point, *see also supra* n.7, I underscore my view that the majority's decision to declare GPS reporters' identities subject to disclosure conclusively addresses a discrete issue not encompassed in our allocatur grant, despite the likelihood of significant negative impacts as well as the majority's recognition that potentially dispositive factors are "clearly not implicated in this case." *Id.* As described *supra*, the agency, not the trial court judge, categorizes a report, and whether the trial court judge can or should override this agency function is not before us; further, conditioning a reporter's confidentiality on this after-the-fact determination appears to me an absurd, if not harmful, conclusion.

[11]     http://www.pacwrc.pitt.edu/Curriculum/1300_PA%20Rsk%20Assssmnt_BsterSht/ Handouts/HO%203%20ARfrncMnlFrThPAMdlOfRskAssssmnt_CPSLRevision2015%20 (2).pdf

*Id.* at 22-23. In its updated guidance to county agencies regarding the initial assessment of GPS reports, the Office of Children, Youth and Families instructs "[i]t is critical that county agencies seek information regarding the child and family's prior history of child welfare involvement . . . . Prior referral history, previous indicated reports of abuse or neglect, and prior services provided to the family offer important context to inform decision making. . . . It often entails going beyond the [reported] maltreatment and the underlying motivations of an individual making a report." OCYF Bull. No. 3490-20-08 at 4.

For these reasons, I cannot agree with the majority's determination appellant's prior experience with the agency from 2013 to 2015 — which includes the removal of one child for over a year due to the structurally unsound and deplorable conditions in the home, including lack of heat and hot water — is "totally irrelevant." Majority Opinion at 43. The agency's requirement to assess it makes it relevant; the particular circumstances, including the passage of time and any subsequent history, afford it due weight. I note the majority's conclusion appellant's DHS history was "stale" relies, in part, on the assertion there was no recurrence of the prior problems, despite its recognition a subsequent petition to compel cooperation was granted in 2016, and the trial judge, who had presided over both the prior dependency petition and the 2016 petition to compel, "may take into account these prior encounters." *Id.* at 6 n.4, 43 n.19. In the 2016 petition, DHS averred the family's home lacked water service, which was confirmed by the utility company. Motion to Compel Cooperation, 10/27/2016, ¶ 3(d). The majority further rests its legal conclusion of staleness on indefinite or nonbinding jurisprudential statements which, as a result of today's decision, are now the law of the Commonwealth despite the

fact the issue was not squarely before the Court — and not preserved or developed through the litigation in the lower tribunals.[12]

D.

Lastly, as the Superior Court aptly explained in its analysis below, the standards applicable to *ex parte* criminal warrants are ill-suited in cases such as this one where an evidentiary hearing is held and the parties may present and cross-examine witnesses. *See Interest of Y.W.-B.*, 241 A.3d at 385-86. Where an *ex parte* warrant issues without notice to the target of the search, the four corners of the affidavits supporting the warrant must speak for themselves with sufficient particularity, reliability, and connection between the search and the need, such that a surprise invasion would be justified. For law enforcement seeking evidence to prove a suspect committed a crime, such a showing is a fair requirement; criminal activity will usually leave a "trail of discernible facts" available whereby probable cause may be established. LaFave, 5 *Search & Seizure* §10.3(a) (6th ed.). This is not the case where a safety threat exists behind closed doors, especially if the victim is not old enough to attend school, cannot communicate clearly, or is harmed in a way that does not leave clearly visible injuries. *See id.* In such circumstances, the "four-corners" requirements of personal knowledge or reasonably trustworthy information from others to show a specific link to the home would require an agency to make a probable cause showing of a thing they do not know exists in a place accessible only to

---

[12] Moreover, the majority's conclusion in this regard is in tension with other aspects of dependency law, involving a significantly stricter clear-and-convincing burden of proof, in which prognostic evidence is routinely admitted to support an adjudication. *See In re R.W.J.*, 826 A.2d 10, 14 (Pa. Super. 2003); *see also, e.g., N.J. Div. of Youth & Family Servs. v. Wunnenburg*, 408 A.2d 1345, 1348-49 (N.J. Super. Ct. App. Div. 1979) (holding an adjudication of "unfitness" in relation to three older siblings twenty-two months prior to the requested investigation regarding parents' newborn child was a sufficient basis to authorize home entry, "[p]arental unfitness is a personal characteristic which, ordinarily, does not vanish overnight, or even within weeks or months.").

those who would hide its existence.[13]  In this sense, even the term "allegations" is something of a misnomer, having different meanings whether in connection with the original reporter, the GPS assessment report, or the petition to compel; further, the petition is not "affied to" by an individual with personal knowledge, but verified by a legal representative on behalf of the agency.  Moreover, the agency cannot truthfully allege in a verified petition that a home contains safety hazards when seeking an order to investigate whether the home contains safety hazards.[14]  And, as a result, we are left with the quagmire we must now resolve.

Nevertheless, where the target of the search in such cases has an opportunity to challenge the search — before it occurs, through the adversarial process, in a court of law subject to appellate review, where a judge assesses credibility and has the authority to direct the bounds and circumstances of the search — I see little reason for typical warrant constraints to apply.  I am therefore unpersuaded by the majority's pronouncement the evidence at a hearing on a petition to compel cooperation must be cabined by the allegations in the petition.  *See* Majority Opinion at 43-44.  Unrelated risk factors may be identified in the course of an investigation; preventing the consideration of additional, relevant evidence beyond the allegations in the petition would appear only

---

[13] I note, as described *supra*, the reporter in such a case will likely be someone close to the child whose confidentiality should be maintained for the child's safety, whether the report is coded as a CPS or GPS.

[14] The majority observes, though DHS testified the GPS report contained allegations of homelessness and inadequate basic care, "the Petitions to Compel d[id] not state that [appellant] was homeless" or "describe any generalized [allegations of] 'inadequate basic care[.]'"  Majority Opinion at 37.  I counter that DHS could not aver appellant was homeless or provided inadequate basic care because it was unable to obtain appellant's cooperation to rule in or out whether these concerns were true; if such facts were available, an order to compel cooperation would be unnecessary.  However, as discussed further *infra*, I see no reason why DHS could not aver in its petition what categories of concern it sought to assess.

to further delay resolution of the matter to the detriment of all involved. Our Rules of Juvenile Court Procedure allow for the liberal amendment of pleadings, oral motions, the forgiveness of certain defects in the interest of expeditiously stabilizing the child's circumstances, the possibility of continuances in the interests of fairness, and assurance of due process safeguards, such as adequate notice. *See* Pa.R.J.C.P. 1122, 1126, 1334, 1344. We need not depart from these principles where an evidentiary proceeding commences from a petition to compel cooperation.

Thus, in my view, several of the judgments foundational to the majority's analysis, made here within the specific confines of establishing probable cause as opposed to definitive proof, unduly restrict as a matter of law the discretion and scope of an agency's child protection investigation. These judgments also hamper rather than encourage the more complete assessment of fact-bound risk factors better suited to the discretionary functions of the agency, and the factfinding function of the trial court, than to the review function of an appellate court. Nonetheless, I still agree with the majority's result, for reasons that follow.

### III. Probable cause and administrative searches

As we have explained many times in our criminal law jurisprudence, the United States Supreme Court dictates the requisite probable cause to warrant a search by law enforcement in terms of reasonableness and fair probabilities based upon a totality of the circumstances; that is: based upon a "balanced assessment of the relative weights of all the various indicia of reliability (and unreliability)" of all the circumstances in a warrant affidavit, the magistrate should make a commonsense, non-technical decision of whether there is a fair probability of discovering evidence of criminal activity. *Illinois v. Gates*, 462 U.S. 213, 232, 234-38 (1983) ("[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts — not readily, or even usefully,

reduced to a neat set of legal rules."); *see also*, *e.g.*, *Commonwealth v. Clark*, 28 A.3d 1284, 1287-88 (Pa. 2011) (applying *Gates*, the reliability of hearsay information in an anonymous tip need not depend on the veracity and basis of knowledge of the informant if corroborated by other information).

However, the High Court has also explained this **traditional** "**probable-cause standard is peculiarly related to criminal investigations**" and is "unhelpful in analyzing the reasonableness of routine administrative functions, especially where the [g]overnment seeks to prevent the development of hazardous conditions[.]" *National Treasury Employees v. Von Raab*, 489 U.S. 656, 667–68 (1989) (internal quotation marks and citations omitted; emphasis added), *citing*, *inter alia*, *Camara v. Municipal Court of San Francisco*, 387 U.S. 523, 535 (1967). Though searches for administrative purposes, like searches for evidence of crime, are encompassed by the Fourth Amendment, "[p]robable cause in the criminal law sense is not required[,]" *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 320 (1978), and "**may vary with the object and intrusiveness of the search**," *Michigan v. Tyler*, 436 U.S. 499, 506 (1978) (emphasis added), *citing Camara*, 387 U.S. at 538. *See also O'Connor v. Ortega*, 480 U.S. 709, 723 (1987) ("[T]he appropriate standard for administrative searches is not probable cause in its traditional meaning."); *New Jersey v. T.L.O.*, 469 U.S. 325, 341 (1985) ("Where a careful balancing of governmental and private interests suggests that the public interest is best served by a Fourth Amendment standard of reasonableness that stops short of probable cause, we have not hesitated to adopt such a standard."),[15] *citing, inter alia*, *Terry*, 392 U.S. at 1,

---

[15] The majority cites *T.L.O.* to support its pronouncement the Fourth Amendment "applies equally" to criminal and noncriminal investigations. Majority Opinion at 33-34, *quoting T.L.O.*, 469 U.S. at 335. I do not disagree that the Fourth Amendment applies to both. However, in my observation, *T.L.O.* does not support the proposition the provision applies in equal measure in both situations; rather, it dispensed with traditional probable cause requirements and held searches of school students required neither a warrant nor "strict

*and Camara*, 387 U.S. at 534–539; *Griffin*, 483 U.S. at 873 ("[I]n certain circumstances government investigators conducting searches pursuant to a regulatory scheme need not adhere to the usual warrant or probable-cause requirements[.]").

Under the principles developed through the High Court's jurisprudence, the requisite demonstration of cause to justify an administrative search turns on a more generalized notion of reasonableness than traditional probable cause, ranging from a reasonable suspicion of some existing code violation, *see Marshall*, 436 U.S. at 320, to a showing that reasonable legislative or administrative standards for conducting an inspection would be satisfied, *see Camara*, 387 U.S. at 536-38, or where "special needs, beyond the normal need for law enforcement" would make the traditional probable-cause requirement impracticable, *Griffin*, 483 U.S. at 873. *See also O'Connor*, 480 U.S. at 723.

I would not, as the majority does, reject the relevance of *Camara* with respect to child protection home inspections. *See* Majority Opinion at 24-25. Nor do I urge the wholesale application of *Camara* in these types of cases. However, principles from *Camara* remain foundational to administrative search jurisprudence among the federal courts, and are omnipresent throughout the cases and scholarship regarding the constitutionality of child protection investigations — including most of the cases cited by the majority, underscoring its importance to the matter at hand.[16] In addition to confirming

adherence to the requirement that searches be based on probable cause" in favor of a justification based "simply on the reasonableness" of a search which best serves the public interest. *T.L.O.*, 469 U.S. at 340-41; *but see* Majority Opinion at 23-24 n.14.

[16] *See, e.g.*, *Tyler*, 436 U.S. at 509; *T.L.O.*, 469 U.S. at 337, 340; *Roska*, 328 F.3d at 1248; *Walsh*, *supra* n.3. The majority indicates these cases do not particularly rely on *Camara* nor contradict its conclusions that no social worker exception to the Fourth Amendment exists and that "traditional probable cause requirements" apply in the context of a child protection home assessment, *see* Majority Opinion at 23-24 n.14; but I respectfully disagree.

the Fourth Amendment applies even to routine home inspections by non-law enforcement government officials, *Camara* articulated a basis to "vary the probable cause test from the standard applied in criminal cases" in administrative searches, by degree of

---

Addressing the government's entry and inspection of a private property for the purpose of determining the cause of a fire, *Tyler* explicitly relied upon the *Camara* principle that the probable cause showing required to authorize an administrative search warrant is distinct from the "traditional showing of probable cause applicable to searches for evidence of crime," which would apply if arson was suspected, but otherwise "may vary with object and intrusiveness of search" and satisfied by compliance with relevant regulatory standards for conducting the search. *See Tyler*, 436 U.S. at 506 & n.5., 511-12.

Contrary to the majority's review of *T.L.O.*, respectfully, that decision **did** rely on *Camara*'s balancing principle, significantly weighing the prohibitive burden of obtaining a warrant in favor of maintaining safety and order on school grounds, to curtail the privacy rights of students. *T.L.O.*, 469 U.S. at 337 ("[T]he standard of reasonableness governing any specific class of searches requires 'balancing the need to search against the invasion which the search entails.'"), *quoting Camara*, 387 U.S. at 536–537; *id.* at 340-41; *see also supra* n.15.

Though declining to excuse child protection social workers from warrant protocols for the home entry and removal of a child not believed to be in imminent danger, the Tenth Circuit in *Roska* recognized "the Fourth Amendment's strictures might apply differently to social workers" whose principal focus is the welfare of the child, "justif[ying] a more liberal view of the amount of probable cause that would support an administrative search" and assenting to "something approaching probable cause." *See Roska*, 328 F.3d at 1249-50.

Additionally, I note other cases cited by the majority do not lend support for the proposition that the same notion of criminal-law probable cause applies in an administrative child protection proceeding. *See* Majority Opinion at 34, *citing, e.g., In re Robert P.*, 132 Cal. Rptr. 5,11-12 (Cal. Dist. Ct. App. 1976) (indicating the **Fourteenth Amendment** is implicated in such proceedings, but explicitly declining to extend the Fourth Amendment's exclusionary principles). *See also id.* at 26, *citing Von Raab*, 489 U.S. at 668. Upholding the routine warrantless drug testing of customs agents who sought promotions to positions involving access to firearms and illicit substances, the *Von Raab* Court relied not only upon the routineness of administrative employment decision-making, but upon "the longstanding principle that neither a warrant nor probable cause, nor, indeed, any measure of individualized suspicion, is an indispensable component of reasonableness in every circumstance. . . . [O]ur cases establish that where a Fourth Amendment intrusion serves special governmental needs, beyond the normal need for law enforcement, it is necessary to balance the individual's privacy expectations against the Government's interests" to determine the level of individualized suspicion in the particular context. *Von Raab*, 489 U.S. at 665-66.

reasonableness in light of the government's particular need to search balanced against the invasion the search entails. *Camara*, 387 U.S. at 537-39. For example, where a criminal investigation requires a level of specificity that certain contraband will be found in a particular location to justify the search of a dwelling, the health and safety inspection program in *Camara*, the goal of which was to prevent the development of hazardous conditions in private homes, required universal compliance with periodic inspections to achieve acceptable results, as "[m]any such conditions—faulty wiring is an obvious example—are not observable from outside the building and indeed may not be apparent to the inexpert occupant himself." *Id.* at 535-37.

On the "government need" side of the reasonableness equation, *Camara* determined the need is met "if reasonable legislative or administrative standards for conducting an area inspection are satisfied with respect to a particular dwelling"; however, the Court also considered whether any less invasive method would achieve acceptable results. *Id.* at 537-40. *Camara* identified factors including the routineness of the search, its lack of personal nature or law enforcement aim, and the notice and time of day it would be conducted (*i.e.*, during normal business hours) to conclude the intrusion was limited, and enforced the requirement of a warrant procedure as a necessary protection of the occupant from unlimited arbitrary discretion, *i.e.*, "rummaging," by the official in the field. *Id.* at 532, 537, 539; *but see* Majority Opinion at 28 (trial court's order granting appellant's home inspection left search "entirely in DHS's discretion" including, "if it so chose, a general rummaging of all of the home's rooms and the family's belongings").

Now echoed in harmony with the eminent criminal-law probable cause standard pronounced in *Gates*, 462 U.S. at 232, 234-38, the importance of *Camara*'s proportional balancing test is not overstated:

> [In *Camara*] the Court has taken the view that the evidentiary requirement of the Fourth Amendment is not a rigid standard, requiring precisely the same quantum of evidence in all cases, but instead is a flexible standard,

permitting consideration of the public and individual interests as they are reflected in the facts of a particular case. This is an extremely important and meaningful concept, which has proved useful in defining the Fourth Amendment limits upon certain other special enforcement procedures unlike the usual arrest and search.

LaFave, 5 *Search & Seizure* §10.1(b) (quotations omitted). The majority's view of the limited types of administrative searches enabled by *Camara* — dragnet searches, and searches involving special subpopulations with reduced expectations of privacy — is certainly useful (to a degree) in identifying the relevant factors underpinning each line of cases. Justification for dragnet searches intended to achieve universal compliance without the need for individualized suspicion is predicated not only on the seriousness of the government's interest at stake, but also on the limitation of discretion by officials, either through a warrant-type procedure or a statutory or regulatory regime setting the terms of the search; for subpopulations whose expectation of privacy is already diminished, a showing of at least some individualized suspicion of wrongdoing is required in the absence of a warrant. *See* Majority Opinion at 26-27; Eve Brensike Primus, Disentangling Administrative Searches, 111 Colum. L. Rev. 254, 263 (2011). But, as the majority aptly observes, a child protection home inspection fits neither of these two categories. *Id.* at 27-28. And as the foregoing explication describes, the principles of criminal law are not wholly suitable either.

The High Court has articulated other factors to consider in assessing the invasiveness of — and requirements for allowing — an administrative search. Where the purpose of the search is law enforcement, the invasion is greater, and traditional warrant and probable cause requirements apply. *See Ferguson*, 532 U.S. at 79-80; *Tyler*, 436 U.S. at 508. However, "[t]he discovery of evidence of crimes in the course of an otherwise proper administrative inspection does not render that search illegal or the administrative scheme suspect." *New York v. Burger*, 482 U.S. 691, 716 (1987). A supervisory relationship "that is not, or at least not entirely, adversarial" between the government-

searcher and the object of the search, *e.g.*, school and student, employer and employee, probation officer and probationer, may demonstrate a special need of the agency "to act based upon a lesser degree of certainty than the Fourth Amendment would otherwise require in order to intervene[.]" *Griffin*, at 879; *see also O'Connor*, 480 U.S. 709, 725-26; *T.L.O.*, 469 U.S. at 339-40. In all cases, determining the reasonableness of any search involves a determination of whether the search was justified at its inception and reasonably related in scope to the circumstances that warranted the interference in the first place. *T.L.O.* 469 U.S. at 341, *citing Terry*, 392 U.S. at 20.

Though the United States Supreme Court has not directly addressed the constitutionality of administrative searches and seizures performed under state child protection statutes, federal district and circuit courts reaching the issue provide consistent guidance to the extent they uniformly, although generally, establish the Fourth Amendment's protections do unequivocally apply to child protection investigations and child removals; the cases are significantly less consistent, however, with regard to the degree of protection to apply. *See supra* at 2 n.1. Given the gravity of interests at stake, the bounds of these cases are important to consider: they arise in the posture of summary judgment in Section 1983 civil rights actions and on the distinctive fact of a **warrantless** search by an agency, which is presumptively unreasonable. *See*, *e.g.*, *Darryl H.*, 801 F.2d 893 at 901; *Tenenbaum*, 193 F.3d 581 at 605; *Franz*, 997 F.2d 784 at 791; *Good*, 891 F.2d 1087 at 1095-96; *Roska*, 328 F.3d 1230 at 1240-42; *Walsh*, 240 F.Supp.2d 731 at 758-60. In this limited context, the courts' resolution turns on whether a basis exists to reasonably support an exigency or other exception to the warrant requirement, or otherwise afford the investigator with a qualified immunity defense, *see*, *e.g.*, *Tenenbaum*, 193 F.3d at 605, but does not reach the merits of whether a warrant should issue on any set of facts. As a result, such cases define characteristics of objectively unreasonable

searches only, and provide little guidance for the magistrate or investigating caseworker to assess what quality and quantity of information available to describe potentially harmful circumstances will establish sufficient cause to justify an invasion of privacy when evidence of danger is suspected to exist, but has not been clearly established.

For these reasons, I view the majority's reliance on *Good* and *Walsh*, which considered only whether exigent circumstances excused a warrantless search, to support its conclusion principles of probable cause in child protection investigations must always adhere to those in criminal investigations, to be somewhat misplaced. The majority quotes *Good* as follows: "'Fourth Amendment caselaw has been developed in a myriad of situations involving very serious threats to individuals and society, and we find no suggestion there that the governing principles should vary **depending on the court's assessment** of the gravity of the societal risk involved.'" Majority Opinion at 20, *quoting Good*, 891 F.2d at 1094 (emphasis added). However, this portion of the opinion refers not to any judicial approval of a warrant or similar request to compel an inspection, but to the district court's erroneous assessment that certain immunity provisions of the CPSL absolved the investigating social workers who performed a strip search of a child, without a warrant or court order, and in the absence of any evidence of imminent danger of serious bodily injury that might excuse their lack of process.[17] *See Good*, 891 F.2d at 1093-96.

---

[17] Similarly, I view the majority's use of *Mincey v. Arizona*, 437 U.S. 385, 393 (1978), *see* Majority Opinion at 21, as even farther afield, as the case dealt with a warrantless multi-day search by law enforcement of a murder suspect's home, during which time the suspect was incapacitated and all of the other household members were safely relocated. 437 U.S. at 389, 393. The High Court determined the state court's decision deeming the murder crime scene *per se* exigent was unconstitutional because it excused the police from obtaining a warrant where there was no imminent danger to "life or limb." *Id.* at 393-95. Furthermore, while I do not endorse a view that a child protection investigation or assessment should be *per se* exigent, I do view the government's interest in halting and preventing harm to children, who are in no position themselves to escape harm inflicted

In contrast, the present case involves no such lack of process. Beyond the protection afforded by any warrant issued and exercised without advance notice to the object of the search, DHS filed a petition to compel appellant's cooperation with its investigation, and appellant received an evidentiary, adversarial hearing to contest the petition before a court of common pleas where the judge found probable cause existed to order a compelled home safety assessment. On the merits, then, we are left with the question of whether the Fourth Amendment requires compelled child protection investigations be supported by the traditional standard of probable cause applicable to criminal investigations as the majority advances. Majority Opinion at 20-21, 23-24 n.14, 33-34. For the foregoing reasons, I suggest it does not, and I would not foreclose the possibility of future development of more clearly-tailored tenets. Presently, however, as described *supra*, there appears to be no real dispute over the Superior Court's expression of probable cause in terms of "fair probabilities" so long as the "fair probability" measured relates to a need for protective services as they are defined by the CPSL.

Accordingly, I now review whether, in light of the totality of the circumstances of DHS's need to search and the concomitant invasion of appellant's privacy, the record contains a substantial basis of fair probability that the home assessment ordered by the trial court would uncover evidence showing one or both of appellant's children were in need of protective services under the CPSL.

### IV. Application

Applying the principles we articulated in *Clark, supra*, to this context, proper dispatch of the totality of the circumstances approach should not "'judg[e] bits and pieces of information in isolation against [ ] artificial standards[,]'" but rather should consider the

---

by those intended to protect them, as significantly different, and in certain situations possibly more urgent, than solving a completed crime that can no longer be prevented.

information appropriately available to the trial court "'in its entirety, giving significance to each relevant piece of information and balancing the relative weights of all the various indicia of reliability (and unreliability)[.]'"  28 A.3d at 1289, *quoting Massachusetts v. Upton*, 466 U.S. 727, 732 (1984) (applying *Gates*, 462 U.S. at 234).

In its opinion, the trial court described the two substantiated GPS reports underlying DHS's initial involvement in September 2013, and Y.W.-B.'s removal from appellant's care and placement in foster care later in October of 2013, as set forth by DHS in the Petition: the first report stated Y.W.-B., then aged fifteen months, was often heard yelling and screaming, appellant hit him on the arm, and although his basic needs were met, the home was dirty and disordered; the second report stated the family's home was structurally unsound, flea-infested, lacked internal walls and heat and hot water, and was in deplorable condition.  Trial Court Opinion, 9/9/2019, at 1-2.  Y.W.-B. remained in foster care until July of 2015, and under protective supervision until the trial court discharged DHS's supervision and dependency petition in November 2015. *Id.*  The court also set forth the additional allegations in the current Petition, *i.e.*: the family had been sleeping outside the Philadelphia Housing Authority; appellant was outside the Authority from noon until 8 P.M. three weeks later and possibly did not feed the child who was with her during that time; appellant was there to protest, and stated she was not homeless and that her previous residence had burned down; DHS confirmed appellant's address through a public welfare records search; DHS located the home and the children's father was present but would not allow the caseworker inside the residence; DHS observed appellant arrive with the children and usher them into the home; appellant refused to allow DHS to assess the home or children; DHS did not enter the home but observed from outside "that one of the home's windows was boarded up"; and, DHS returned

accompanied by police, but appellant still refused entry. *Id.* at 6-7, *quoting* Petition at ¶¶ 3(j)-(m).

Regarding the hearing on the Petition, the court described appellant's testimony, in which she attempted to refuse to answer his questions about her income and ability to feed the children and obtain their medical care, and the court stated its finding the DHS caseworker's testimony was credible. *Id.* at 7-8. The court noted, because the Petition included an allegation the family slept outside the Housing Authority, it was reasonable to ascertain if their housing was stable, and the Petition thereby established probable cause. *Id.* at 8. The court entered an order directing appellant to allow DHS into the home to assess and "verify if [appellant's] home is safe and appropriate," and further set a date and time for the assessment, and provisions for appellant to have a witness present. Trial Court Order, 6/18/2019.

I agree with the majority that the trial court's analysis raises more questions than provides answers about the basis of the court's concern. We can guess about the significance of the prior dependency matter, but without definitive resolution; sleeping outside might mean hovering under a tree at night or napping on a bench in broad daylight — or a myriad of other circumstances not necessarily indicative of safety level; and a single boarded up window might be cause for concern depending on the location and size of the space covered by the board, and what lies behind it. The Petition itself is not much more illuminating,[18] though it provides the additional detail that N.W.-B. was born in

---

[18] The second-to-last page of the Petition contains two paragraphs which provide the movant with the option of checking a box to include them as statements in the verified petition. The box relating to the first paragraph, which requests the court to order appellant to "cooperate with the investigation," is checked. Notably, the box relating to the second paragraph, which states, "the allegations set forth above constitute probable cause to believe [the children are] the victim(s) of child abuse and/or neglect, and probable cause to believe that evidence relating to such abuse will be found in the home[,]" is **not** checked. Petition at 5 (unnumbered). In other words, DHS did not aver in its petition a belief or allegation that probable cause existed.

January of 2015 while Y.W.-B was still in foster care, and she remained in appellant's care during that time. Petition at ¶3(g). The hearing transcript demonstrates the trial judge remembered the family from prior proceedings, and that the family's home address was the same. N.T. 6/11/2016 at 12. However, as explained previously, the DHS caseworker's testimony, deemed credible by the judge, indicated the Petition may have contained mistakes. Indeed, the caseworker directly refuted the Petition allegation she saw the children enter the home — an allegation the trial court nevertheless relied on in its opinion. And while DHS urges us to consider the trial court's determination appellant was "evasive," the court made no such finding — the court observed appellant attempted to refuse to answer its questions, but in the end, she did answer them. *See id.* at 12-14.

Turning to appellant's prior dependency matters, I note the trial court record for the underlying Petition includes the entire dependency court record, presided over since its midpoint by the same trial judge as this Petition. The twenty-five-month-long matter, including Y.W.-B.'s placement in foster care for twenty months due to hazardous housing conditions, is relevant; but all other circumstances incident to the case are relevant, too. Here, the court's record reveals: each case plan and permanency review order noted the parents' full cooperation with the agency and court's orders; the condition of the house, which parents own, was the only problem; parents consistently worked on repairs, they took classes in home repair, and both enrolled in college; and, except for a brief period before the first permanency review, parents were awarded liberal, day-long visits with Y.W.-B. so long as they didn't go to the house. *See* Juvenile Court Docket, entries dated 10/21/2013 – 11/24/2015; DHS Family Service Plan Review, 9/18/2014. Finally, although a subsequent Motion to Compel Cooperation was filed in 2016 averring the water department confirmed the home's service had been shut off, service had been restored and parents applied for payment assistance prior to the hearing. *See* Motion to Compel

Cooperation, 10/27/2016, at ¶3(d); Trial Court Order, 11/23/2016. Thus, the prior dependency court record demonstrates **at least** as much capacity to care for and protect the children as it does concern for risk of harm relating to the conditions existing inside the home at the onset of DHS's involvement in 2013.

Given the aforementioned missing details and other inconsistencies in the record, I cannot conclude it established a fair probability that appellant's children need protective services sufficient to warrant the government's intrusion into appellant's home. Though the trial court, in good practice, included protective parameters in its order to reduce the intrusion of the home assessment, the search nevertheless remains an invasion upon appellant's greatest expectation of privacy, and this record does not demonstrate a substantial basis for DHS's need to invade.

If this result begs the question what would have sufficed, I suggest that, in this case, it would have required only a modicum more, particularly in light of the fact appellant admitted after the home assessment that the home's front room had been damaged by a fire. N.T. 6/18/2019 at 18-19. A photo of the home's exterior, a sworn statement of observed or believed fire damage, certainly, more detail from the anonymous reports would have been useful, as well as the GPS report document if possible. Given the Petition's evidentiary import, accuracy in the pleading is a must; but even an oral motion to amend errors may have rehabilitated its weakened reliability. In addition, reference to agency regulations or policies addressing the scope of the search and its confidentiality would be demonstrative of necessary limitations on the discretion of the caseworker in the field.[19] But more importantly, some explanation of the agency's risk assessment was

_____

[19] The majority declines to address the particularity of the search order directly, but, as I noted above, it does criticize the order's lack of limitation as authorizing "general rummaging of all of the home's rooms and the family's belongings." Majority Opinion at 28; *see also id.* at 13 n.11; *supra* at 26. This concern may be somewhat overstated in this case: appellant did not complain of any rummaging from her prior experiences with

crucial, notwithstanding the trial judge's past experience with these individuals, in order to establish in the record some basis for why these pieces of information raised the agency's concern and how the search satisfied administrative standards. And, while a home assessment may be the most powerful tool for obtaining reliable information, there are other tools available to further an investigation, for example: school visits for children who are old enough, discreet questions to neighbors when appropriate, or as DHS did in 2016, a confirmation of utility services (or lack thereof) to the home. Where other efforts are unavailable, or attempted and thwarted, an explanation of those efforts is a considerable factor. Although, as Judge Beck observed, "the frustration agency officials experience in carrying out their tasks must be immense," it is nonetheless "critically important that we [e]nsure agencies act within the bounds of the Constitution." *Petition to Compel*, 875 A.2d at 380 (Beck, J., concurring). It is, after all, a government investigation.

The trial court's function is to resolve conflicts in evidence, and appellate courts generally should afford great deference in dependency matters to the judge who has observed the parties over multiple hearings. *See Interest of S.K.L.R.*, 256 A.3d 1108,

---

DHS, and acknowledged the caseworker performing the assessment in this instance "had a good attitude," N.T. 6/18/2019 at 15; the trial court generally described the walk-through safety inspection several times, *see* N.T. 6/11/2019 at 17-18, 24-25, 32; and the caseworker testified DHS has a standard walk-through procedure for assessments, *see* N.T. 6/18/2019, at 10-12, that would clearly be violated by "general rummaging." Nevertheless, the prevention of such unreasonably intrusive searches is a valid constitutional concern, and a petition to compel a home assessment may be an individual's first contact with the child protection and dependent court systems. All practical efforts should be made to assure parties of the expectations and limitations of the search, such as providing reasonably detailed orders, or directing access to relevant agency policies and procedural safeguards. *See* 55 Pa. Code §3130.23 ("County agency rules and policies describing the services offered by the county agency, service policies and procedures, eligibility for services, financial liability of clients and the rights of clients to receive or refuse services shall be available to the public for review or study in every county agency office on regular workdays during regular office hours.").

1127 (Pa. 2021). As the majority relates, these observations are certainly relevant; however, to obtain the benefit of them upon a challenge, they must be invoked in some manner. *See* Majority Opinion at 43 n.19. In this instance, in my view, the trial court's resolution only further obfuscated any indicia of reliability attending the information provided by DHS. To justify a deprivation of constitutional magnitude where the court does not otherwise have dependency jurisdiction over the child, the court relying on its prior experience, like the agency, must articulate in the record the basis for its belief; "it cannot simply assert the belief without explanation." *Petition to Compel*, 875 A.2d at 380.

Justice Todd joins this concurring and dissenting opinion.